## CALLER TIMES PUB. CO. et al. v. CHANDLER.

### No. 10308.

Court of Civil Appeals of Texas. San Antonio.

Oct. 19, 1938.

Rehearing Denied Nov. 30, 1938.

John A. Mobley, Purl & Pearson, and Kleberg, Eckhardt & Lowe, all of Corpus Christi, for appellants.

Gordon Gibson and Mitchel Schwartzman, both Laredo, for appellee.

SMITH, Chief Justice.

Dr. C. C. Chandler brought this action for libel against Caller Times Publishing Company, a corporation, and W. G. Kinsolving, its editor and publisher, for actual and exemplary damages alleged to have been sustained by him on account of the publication of a series of news items in the Corpus Christi (morning) Caller and Corpus Christi (evening) Times, both owned by the corporation. Upon a peremptory instruction that portions of the publications were libelous per se, without regard to the truth thereof, and entitled Dr. Chandler to damage in "some" amount, the jury found for him in the sum of $10,000 actual damages. The claim for exemplary damages was abandoned by the plaintiff in the course of the trial. Judgment was rendered in accordance with the verdict, and the defendants below have appealed. They will be referred to as defendants and Dr. Chandler as plaintiff, as in the trial court.

The record and briefs are quite voluminous, and can be given only the most general notice in this opinion, notwithstanding a careful study of them has consumed much time in this Court.

It appears that plaintiff was indicted by a grand jury in Nueces County, in one case upon a charge of conspiracy to burglarize the vault of the defunct City National Bank of Corpus Christi, and in the other case upon a charge of arson. Both indictments appear to have been founded upon statements, or, rather, confessions of others indicted jointly with plaintiff, and made before an assistant District Attorney. The newspapers (one a morning and the other an afternoon publication, both owned by defendant corporation) published not only the facts of the return of the indictments and the charges therein, but the facts and substances of the confessions of the alleged co-conspirators. Plaintiff's claims of libel rest upon the reports of those confessions, and not upon the reports of the indictments.

■ The court peremptorily charged the jury that the reports of the confessions were libelous as a matter of law, and directed them to find for plaintiff such amount of damages as they should find he was entitled to under the evidence and the charge on the measure. The charge amounted to an instruction that there was no evidence of the truth of the statements of fact embraced in the publications, or, at least, that the evidence thereof was insufficient to raise issues of fact.

The peremptory instruction raises the incidental question of law of whether the confession of an alleged conspirator, or accomplice, of one indicted for crime, is such a matter of privilege as a newspaper may publish it without liability therefor, as for libel, under the provisions of §§ 1 and 4, Art. 5432, R.S.1925, as amended by the Acts of 1927 (40th Leg. p. 121, ch. 80, § 2 [Vernon's Ann.Civ.St. art. 5432, subds. 1, 4]), as follows:

"Art. 5432. Privileged matters.

"The publication of the following matters by any newspaper or periodical shall be deemed privileged and shall not be made the basis of any action for libel.

"1. A fair, true and impartial account of the proceedings in a court of justice * * * or any other official proceedings authorized by law in the administration of the law. * * *

"4. A reasonable and fair comment or criticism of the official acts of public officials and of other matters of public concern published for general information. * * *"

■ It appears from the record that persons charged jointly with plaintiff in the indictments in question, and prior to the return of those indictments, made written confessions under oath to an assistant district attorney, in which they implicated plaintiff in the commission of the alleged crimes. The substance of these confessions was incorporated in the publications complained of by plaintiff as libelous, and constitute the gravamen of the alleged libel. Defendants contend that those confessions were privileged, by virtue of the quoted statute, and that defendants are therefore excused from liability for the publication thereof. We overrule this contention. We are of the opinion that those purely ex parte statements, not made in the course, or under the sanctity, of a judicial proceeding, were not privileged within the contemplation of the statute. 27 Tex.Jur. p. 660, § 41; Belo & Co. v. Wren, 63 Tex. 686

We are of the further opinion, however, that the evidence adduced upon the trial, however fanciful and unreasonable it may appear to counsel, nevertheless efficiently raised the issue of the truth of the statements complained of as libelous, and the truth is always a complete defense to an action for libel of whatever degree. It is expressly made so by statute. Art. 5431, R.S.1925, as amended by Acts 1927 (40th Leg. p. 121, Ch. 80, § 1 [Vernon's Ann.Civ.St. art. 5431]); 36 Cyc. p. 1231, § 103; 27 Tex.Jur. p. 634, § 29; Cotulla v. Kerr, 74 Tex. 89, 11 S.W. 1058, 15 Am.St.Rep. 819; Moore v. Davis, Tex. Com.App., 27 S.W.2d 153; Id., Tex.Com. App., 32 S.W.2d 181. And it is sufficient if the publication be substantially true, particularly in cases of newspaper articles. 27 Tex.Jur. p. 635, § 30.

As we have been unable to avoid the conclusion that the evidence raised the issue of the truth of the statements complained of, we deem it not only unnecessary, but improper, in view of another trial presumably upon substantially the same evidence, to discuss the evidence in any detail, except certain claimed inaccuracies which plaintiff asserts, and the trial judge so declared, were libelous as a matter of law, and unsupported by any testimony.

For example, in the published stories plaintiff was referred to as a "former choir singer," whereas, he claims this reference was libelous in that it carried the inuendo that having been a choir singer in the past he had by some reprehensible conduct lost or been compelled to relinquish that status, and the court charged the jury that the statement was libelous as a matter of law. It is conceded that plaintiff had been a choir singer, and apparently continued in that avocation up to the time of the publications in question. We doubt if the publication justified the implications and inuendos plaintiff attributes to it, but, certainly, it did no more than raise an issue of fact, to be determined by the jury, as to the effect of the statement upon the ordinary person reading it in the newspapers, which is the true test. Express Pub. Co. v. Southwell, Tex.Civ.App., 295 S.W. 180, writ refused; First State Bank v. Parker, Tex.Civ.App., 28 S.W.2d 269.

It was stated in the newspapers that plaintiff was arrested on an indictment "charging him with conspiracy to rob the City National Bank shortly after the bank was closed." Plaintiff contends and the court charged the jury, in effect, that this allegation was libelous and was not substantially true. The facts are, it seems, that in the indictment, returned in November, 1933, plaintiff was charged with conspiracy to burglarize a building controlled by one Malcom Meek, who was shown to be receiver of the defunct City National Bank, which had failed on November 1, 1931. The bank vault was the one actually involved. These discrepancies of fact are not such as to support a peremptory instruction that they were libelous as a matter of law. Moreover, the statements were substantially true, in fact.

Plaintiff further complains of the statement that he was charged in the newspapers with having been indicted for the offense of conspiracy to "rob" the bank, whereas, in truth, the indictment was for conspiracy to "burglarize." The offenses are of equal grade, and no injury is shown by the published inaccuracy. Times Pub. Co. v. Ray, Tex.Civ.App., 1 S.W.2d 471; Ray v. Times Pub. Co., Tex.Com. App., 12 S.W.2d 165.

In the same category was the published reference to plaintiff as a "fair concessionaire." The record seems to show, even by his own testimony, that plaintiff exhibited a strange freak of an apparently unknown species of animal, at one or more fairs in the midwest, under some sort of temporary permission or concession from those in authority. At most, it would be for the jury to determine, from all the facts and circumstances in evidence, if plaintiff was in fact a "fair concessionaire," and, if not, whether the false reference was libelous, and materially injured plaintiff.

In that connection, it was stated in the published stories, as brought forward in plaintiff's brief, that "Chandler returned here from the north recently *after having been exonerated* in the fatal shooting of Calvin Howard, 27, of Rio Frio, in a concession tent at the county fair in Connersville, Ind. *Officers said they found he had been cleaning his gun when it was discharged accidently.*" Plaintiff complains of the italicized passages. His own testimony shows that when the animal freak was on exhibition in a tent at a fair in the Indiana town, a drunken customer, in a playful mood, tried to get possession of a sawed-off shot gun con-

cealed under the animal cage, when plaintiff interfered, and, in a scuffle between them, the gun, in plaintiff's possession, was accidentally discharged, killing young Howard, to whom plaintiff had turned over the animal for exhibition and whom plaintiff was assisting in getting started in the venture. It further appears from the record that local officers at Connersville investigated the circumstances of the tragedy, which plaintiff, of course, deeply deplored, and, concluding that plaintiff was not at fault, did not prosecute him. If opprobrium was inferable from the published version of the tragedy, such inference could be properly drawn only by the jury, in a jury case. It was not a prerogative of the court, under the ascertained facts. We are of the opinion that the use of the word "exonerated" was not, in the undisputed circumstances, libelous per se, and the jury could well have found from plaintiff's own evidence that the published explanation that the gun was accidentally discharged while plaintiff was cleaning it, was not so harmful as would have been the more accurate explanation that the accident occurred as a result of a scuffle for its possession between plaintiff and a drunk man.

Numerous other statements in the published articles, included in those condemned by the trial judge as libelous, were of doubtful purport, and were denounced without regard to the issue of substantial truth. These statements are pointed out and discussed in the briefs, but we have mentioned only a few of them in this opinion, which would be prolonged inexcusably by a discussion of them. The publications were, in the main, of such nature that only jury findings that they were substantially true in fact could excuse defendants from liability for the injuries obviously sustained by plaintiff as a result of the utterances. But there was material evidence, whether false, fanciful, incongruous or silly, as some of it appears to be, to support the statements, and it was for the jury, and not the court, to appraise that evidence and resolve the issues raised by it. We sustain defendants' first proposition.

Plaintiff has propounded several propositions based upon cross-assignments of error, of which there are thirty-six. It is first contended that defendants' pleading setting up the confessions upon which much of the published stories were based should have been stricken on plaintiff's exceptions. The rule, stated generally, is that every pertinent fact and circumstance out of which an action for libel arises, even though they do not justify a publication, are admissible, if pleaded, in mitigation of damages resulting from the publication. Art. 5431, R.S.1925, as amended by the Acts of 1927 (40th Leg. p. 121, Ch. 80, § 1 [Vernon's Ann.Civ. St. art. 5431]); Newell Lib. & Slander (4th Ed.) §§ 768, et seq.; 27 Tex.Jur. p. 710, § 62. Under the cited statute, it is necessary that such facts and circumstances be pleaded as a basis for their admission in evidence, and upon that conclusion we overrule plaintiff's propositions 14, 16, 18, 19, 20, 21.

Plaintiff's 15th and 17th propositions are to the effect that allegations and proof of his failure to deny or reply to the published stories was no defense to repetition of those publications, and could not mitigate the resulting damages, if the stories were found libelous and false. No authorities are cited to this point by either party. It seems that, while there is no reported Texas case, so far as we have ascertained, the authorities differ in other states, some holding pleading and evidence of silence on the part of the libeled party to be admissible in defense or mitigation; some holding to the contrary. Annotation, 56 A.L.R. 255. This being a case of first impression in this State, we are of the opinion, and so hold, that the failure of a person to answer or deny a libelous newspaper publication is not available as a defense to his suit for libel, or in mitigation of damages sustained by him as a result of the libel. We sustain plaintiff's 15th and 17th propositions, and the cross-assignments of error upon which they are based.

Other questions are presented in the appeal, but as they are not likely to arise upon another trial, they need not be discussed or decided here.

But, for the error in withholding from the jury the issues of the truth and effect of statements, raised by material evidence, the judgment will be reversed and the cause remanded for another trial.

## On Motion for Rehearing.

In his motion for rehearing plaintiff asserts that some of the statements in the original opinion were unfair and prejudicial to plaintiff. We believe that in his zeal counsel for plaintiff has misin-

terpreted those statements, but, realizing the gravity of the case and its implications, and in order to obviate any possible charge of unfairness, we will set out the testimony of plaintiff himself on the points stressed in his brief, so that the reader may draw his own inferences of fact.

It is first contended that the statement in the original opinion concerning the alleged libelous reference to plaintiff as a "fair concessionaire," was unfair. We quote from plaintiff's own testimony on the point:

"Q. Now, Dr. Chandler, I want you to tell me something about this incident that happened at Connersville, Indiana. Who was Calvin Howard? A. Calvin Howard was a boy that lived at Frio, Texas. He and I had hunted together. They are mountaineers and ranchmen.

"Q. He and his brother? A. He and his brother, Seth.

"Q. I believe you had at that time a strange animal—a sort of freak or monstrosity—which those boys had on exhibition at Connersville (Indiana), is that correct? A. Yes, sir.

"Q. That was part of an exhibit they had there? A. Yes, sir.

"Q. Did you have any interest in that exhibit? A. I owned the animal.

"Q. Well, will you please tell the court and jury how it happened that those boys had that exhibit there. Make it brief. I believe you took the animal to Chicago with you, did you not? A. Yes, I went straight from here to Chicago. I had seen in the paper where some men had ridden bulls from Texas and other things, had gotten publicity for their cities, and this being such an odd animal, I took it along as a patriotic idea, and thought probably I could get some publicity for Corpus Christi, and I did. * * *

"A. After I had gotten so much publicity and people had come to our house trailer to see the animal, among those were one of the Miller Brothers, with the 101 Ranch Shows, and they were on the fair grounds in Chicago, and they wanted me to put the animal in or go with them when they left there. In other words, they were going to put in side shows, and I couldn't go with them, and I thought of these boys, whom I had always wanted to help, and they had expressed themselves as wanting to see some of the world, and I wrote them a letter and asked them if they would come and take charge of the show, and they did. But meanwhile, between the time they got my letter, while they were on the road, which took them five days, Miller Brothers had gone broke, that is, they had closed them out at the grounds, and that was 'blowed up' you might say. Then I felt obligated, and I then bought the tent and had signs painted and cages made and everything to put these boys in business. They wanted to go on with it, with the showing of it.

"Q. Did you go in partners with them, or were you going to get your money back? A. No, here was my proposition to Boss Howard: I had something like $150.00 invested in the equipment. My animal had cost me $100.00, but I didn't ask for any of that, and they were to have paid me fifty per cent of their receipt until they had reimbursed me for this equipment.

"Q. That is, the tent and so on that you bought for them? A. Yes.

"Q. And beyond that, what interest did you have in the profits after that? A. Oh, I didn't intend, and they knew that I wasn't to have gotten anything.

"Q. You were to get your money back? A. Yes, sir.

"Q. Now, tell us what happened on the fair grounds when you were visiting them in Connersville. A. Well, I think I had better explain further, when it came time to open, they were a little afraid to go out, they had never dealt with such things, and we had planned to visit a doctor friend in Cincinnati, my wife and I and children, and the fair was on there, so we went down there together, and I helped them get started there, and the doctor and his wife were not at home, so we agreed to go on one or two other stops with them, and I did. * * *

"Q. Well, now, how many fairs was he exhibited in to the public? A. In three.

"Q. What were those? Name those fairs. A. Once at the fair grounds at Cincinnati, three days, and I think it was two or maybe three days at Batesville, I think it was Batesville, Ohio, and the third was at Connersville, Indiana. I think it was three days there.

"Q. He was also exhibited at the World's Fair or the Century of Progress, in Chicago, was he not? A. No, sir, I showed him, without charge, to the Boy Scouts of America up there. It was the only place he was ever showed.

"Q. You had private showings of him to scientists and zoo people, I believe you said? A. Oh, they would come to where we lived and look at him, yes.

"Q. You had the animal with you? A. Yes.

"Q. Now, who made the arrangements for its exhibition in the three fairs that you have spoken of? A. I made the arrangements for him.

"Q. With the managers of those fairs?. A. Yes. * * *

"Q. Now, you arranged for the purchase and construction of the cage? A. Of the—

"Q. Of the cage in which he was kept in your exhibit? A. Yes, I had it built.

"Q. And the tent? A. Yes, I bought the tent for them.

"Q. Doctor, a lecture would accompany his exhibition, from time to time? * * * Did you deliver that lecture? A. Sometimes, when men would call, like from zoos, and I did several times to relieve the boys, they wanted to get off. * * *

"Q. Now, Doctor, during the time that this animal was exhibited at those various fairs you lived there on the fair grounds in your trailer? A. Yes.

"Q. And these other two young men slept there in the concession? A. They slept in the tent."

And plaintiff complains of the version, given in the original opinion, of the deplorable circumstance of the accidental killing, by shooting, of a young man in the show tent at Connersville, Indiana. We quote from plaintiff's own testimony upon that point:

"The third stop was at Connersville, and I was on the grounds and about the tent, and there was a drunk man came in, very nice sort of chap, but gloriously drunk, and he had bothered them quite a lot and they came to me about it, and I took him out and he was very nice about it; and in the meanwhile he came back, and that continued several times.

"Q. What did he do? A. Just interested, just wanted to be in there. And he discovered a little sawed-off shotgun that was lying under the table that these animals were on, and a cloth was around that table, and there was a little fence around it for the man who lectured to keep the people back. The wind was blowing this cloth and he saw this little sawed-off shotgun, and he asked to see it, and I pushed him back and told him he couldn't see it, and that continued for a little bit, and finally he was trying to get this gun from the other side of the cage, and a lady called my attention to it, and I went around and asked him to go out again, and I came back to the same side that I was on of the cage, and in a little bit he was trying to get the gun again, and I just remarked that I'd better unload the gun before the drunk got hold of it and kill somebody or injure somebody. I stooped down under the table to get the gun, and as I came up with it, I was unbreaching it and this man grabbed me from over my back, and just pulled me back in this position (illustrating), and the gun fired at that time, and I don't think it possible for my finger to have been on the trigger, for I was unbreaching it with my thumb, and when the gun fired it went off diagonally through the corner of the tent, and Calvin Howard, or Boss Howard was his nickname, was standing there at the ticket box and he received the charge in the back. * * * He died the next day. * * *

"Q. Where was that gun kept, did you say? A. It was lying under the cage under the table that the cages were on.

"Q. It was your gun, wasn't it? A. Yes.

"Q. Was it, had the barrel been sawed off when you bought it, or did you saw it off, Doctor? A. No, it was a gun my father gave me. He sawed it off so he could carry it in his car—just a common shotgun, with the barrel sawed off."

Plaintiff points out that in one place in the original opinion it was stated that the burglary indictment was returned "in May, 1932," whereas, the true date was in November, 1933. The error has been corrected in the original opinion.

We conclude that the matters disposed of in the original disposition were correctly decided. Plaintiff again urges some of his cross-propositions, particularly with reference to the admission of certain testimony over his objections. Fragments of that testimony were, apparently, inadmissible, while other parts were properly admitted, but this is no place, nor is it our function, to dissect the whole and segregate the good from the bad.

Defendants have also filed a vigorous motion for rehearing, resisting, chiefly, the holding of this court that the confessions of plaintiff's alleged co-actors were not

privileged, under the facts of the case, within the contemplation of the provision in Art. 5432, Vernon's Ann.Civ.St., that a matter shall be deemed privileged if "1. A fair, true and impartial account of the proceedings in a court of justice * * * or any other official proceedings authorized by law in the administration of the law. * * *"

We are not unmindful of the forceful argument and reasoning of defendants upon this point, but are not disposed to recede from that holding.

Nor are we disposed to recede from the holding that the mere silence of plaintiff, and his failure to publicly deny the charges and implications of the alleged libelous statement, may not be shown, either in justification of the publication, or in mitigation of the damages resulting therefrom. We are not willing to say that a person subjected in the newspapers to charges of misdeeds forfeits a single right or privilege by refraining from provoking a public controversy over the matter, outside the courts of the land.

Plaintiff's and defendants' motions for rehearing will be overruled.