NO. 07-06-0385-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

FEBRUARY 22, 2008

_____


PAUL MARTIN CLARK AND BLACK CITIZENS FOR JUSTICE,
LAW AND ORDER, INC., APPELLANTS

V.

GLADYS ELAINE BLANTON JENKINS, APPELLEE

_____

FROM THE 3RD DISTRICT COURT OF HENDERSON COUNTY;

NO. 03-066; HONORABLE JIM PARSONS, JUDGE

_____


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


**OPINION**


Appellants, Paul Martin Clark and Black Citizens For Justice, Law and Order, Inc.

(BCJLO), appeal from a judgment rendered in favor of Appellee, Gladys Elaine Blanton

Jenkins, in a libel action. By a sole issue, Clark and BCJLO assert the trial court erred in

denying their motions for directed verdict and judgment notwithstanding the verdict

because: (1) the defamatory statements about Jenkins were made in a written request for governmental action, making actual malice an essential element of her claim, and the evidence was insufficient to establish actual malice, (2) their statements were absolutely privileged because they were made in a petition for redress pursuant to the Texas Constitution, and (3) there was an absence of any finding and/or evidence in support of a presumed finding their petition was a "sham" or was made in bad faith.  We affirm.

## Background

Jenkins,[1] a member of the Athens City Council, filed an action for libel based upon statements made in a memorandum (hereinafter the "Clark Memorandum") authored by Clark, BCJLO's President.  The Clark Memorandum was addressed and published to Daisy Evella Joe, BCJLO's Chief Executive Officer, the Honorable Pete Sessions, United States Representative, and the United States Department of Justice (DOJ), Civil Rights Division.  The Clark Memorandum was subsequently published to the Mayor of Athens, its City Council, the City Administrator, and Police Chief.  The existence of the Clark Memorandum and its contents were generally known in Athens.

---

[1]Jenkins was born and raised in Athens.  She is a mother of three children, employed as the lead teller at the Texas Trust Credit Union, and an ordained minister who practices her ministry at the Church of Living God in Athens.  She was elected to the Athens City Council by the city at large, and her area of representation included North Athens.

2

BCJLO was originally incorporated in 1969 in response to incidents involving black citizens and police officers in the Dallas metropolitan area. BCJLO's initial purpose was to bring citizen complaints against the Dallas police to the attention of the proper authorities. Over the years, BCJLO's purpose has evolved to include assisting persons in pursuing claims before the Equal Employment Opportunity Commission.

Joe became BCJLO's volunteer director in 1982 and subsequently, CEO.[2] Clark became BCJLO's President of Membership in 2002-03. He had received training and certification as a federal records management officer at the National Archives located in Washington, D.C. At the National Archives, Clark was taught to simply record an event through note-taking without filtering what was said. Joe testified at trial that Clark had a knack for notating meetings in a very detailed manner—writing down every "and," "the," and "that."

In the mid-nineties, tension existed between North Athens' black citizens and the Athens Police Department. DOJ's Civil Rights Division assisted the parties in developing an agreement designed to open lines of communication between the Athens Police Department and the North Athens community. In 1999, a Memorandum Agreement was entered into between Athens Police Chief, the NAACP, and an organization known as the Concerned Citizens of North Athens (CCNA). A Citizens Advisory Committee was created to meet on a regular basis with the Athens Police Chief to discuss problems and issues.

---

[2]Joe appeared at trial on BCJLO's behalf.

If necessary, these issues and problems would be brought to the attention of the City Council. The Texas Rangers also offered their assistance by investigating citizens' complaints of harassment and intimidation. From 1999 until 2006, there were six complaints filed with the Citizens Advisory Committee.

In mid-2001, Joe began receiving calls from black residents in Athens including Barbara Bowman and Fred Burke. Bowman and Burke were CCNA members and, subsequently, became BCJLO members. Bowman and Burke complained of intimidation and harassment by the Athens Police Department and wanted BCJLO's assistance because they believed they did not have a voice in Athens. Joe received so many calls from Athens' citizens she was hesitant to get involved. Subsequently, they started calling in on Joe's radio show, *Worker's Beat,* on KNON, with complaints related to the Athens Police Department. Bowman and others called Joe's radio show complaining that a pregnant woman was taken to jail, underwent a miscarriage, and was refused medical attention. Joe found the story hard to believe. She suggested they compile their information and submit their complaints to the authorities.

In the Fall of 2002, Pam Burton, Athens City Administrator, received letters from Joe Baggett, President of the NAACP's local chapter, and Mickey Williams of the CCNA asking to appear before the City Council to discuss the Memorandum Agreement. The agreement had expired and a new Athens Police Chief, Jim Vance, was replacing the current Chief who was a signatory to the Memorandum Agreement. Burton placed discussion of the

4

agreement on the City Council's agenda. She also sent Baggett a letter, with a copy to Williams, indicating the City Council would be discussing the agreement at a regularly scheduled workshop to be held before the City Council meeting scheduled for November 20, 2002. Burton's letter invited them to attend and encouraged them to invite other interested parties.

CCNA members faxed Joe a letter related to the workshop and asked Joe to approach Congressman Sessions. Joe indicated she would send someone to the meeting to take notes on their concerns and then turn the information over to Sessions. Because Joe was unable to attend the meeting personally, she asked Clark to attend. Clark was to meet Reverend Stovall, Pastor of the Camp Wisdom United Methodist Church of Dallas, in Athens, and accompany him to the meeting.

Bowman, Stovall, Clark, and others attended the City Council workshop to discuss the agreement. Mayor King, the City Council members, and Burton were also present. Jenkins attended the meeting in her capacity as a City Council member.

After the Council meeting, Bowman, Stovall, Clark, and other attendees convened at the house of a CCNA member to discuss their concerns. Clark took notes during this after-meeting. The meeting lasted approximately twenty minutes. Bowman told Clark that Jenkins was controlled by Mayor King and that she was ineffective and failed to

5

communicate the concerns of the citizens of North Athens to the City Council.[3]  Joe instructed Clark to take down their complaints and draft a memorandum that would prompt an investigation by Congressman Sessions and DOJ's Civil Rights Division.

Clark drove home that night, and the next morning he delivered his memorandum to Joe.  Joe testified she prepared a cover page,[4] and the Clark Memorandum was delivered to a staff member at Sessions's office.  The Clark Memorandum was also mailed to DOJ's Civil Rights Division.  Although it was Joe's practice to scan such a memorandum before it was sent, she only glanced at the Clark Memorandum and did not notice the criminal allegations related to Jenkins.

In paragraph four of the Clark Memorandum, the following statement was made regarding Jenkins:

> The only black female Athens City Council member is Gladys Elaine Blanton Jenkins.  She is a convicted felon having served time in Texas and California

---

[3]Bowman believed Jenkins was unresponsive to her concerns related to harassment by the Athens Police Department and, more specifically, the death of a North Athens resident.  Jenkins indicated that, when she asked Bowman for facts to back up her accusations, Bowman did not provide any information.  Jenkins believed that, in some areas of the black community, she was considered an outsider because she would not take unsubstantiated allegations to the City Council.  Jenkins testified that Bowman, CCNA, and BCJLO wanted her removed from the City Council.

[4]Joe testified she slid a loose cover page into the envelopes containing the Memorandum that stated "Summary and accounting of meeting in Athens, Texas on 11-20-02 of the city meeting and after meeting with North Athens Black Citizens of Concern approximately 10 people present."  Aside from her testimony, there is no evidence of record of the cover page or its receipt by Sessions or the Department of Justice.

for Prostitution and Drugs. She is controlled by Mayor Jerry King. No one in the State of Texas can hold elective office who has felony convictions. She must be removed from office immediately.

*See* Appendix for full text of the Clark Memorandum.

Joe was unconcerned whether the statements in the Clark Memorandum were true or false. Neither Clark, Joe, nor BCJLO performed any investigation to determine the validity of any factual statements contained in the memorandum including the criminal allegations against Jenkins.[5] Joe agreed the memorandum's statements regarding Jenkins were "very defamatory," "horrible," and she "wouldn't want them published about anyone." She also believed the contents of the memorandum were confidential and she was relying on Sessions and the DOJ to determine whether the statements made were true.

Clark did not appear at trial, but testified by deposition. He indicated he had no belief or disbelief as to the truth of the memorandum's contents. He did not know Jenkins and had no belief as to the statements he made about her. He did not know the people who attended the Council meeting and after-meeting, and had no baseline for the veracity of their statements. He stated he recorded the information the attendees supplied to him. He indicated, however, he did not believe the statement in his memorandum that "[t]he

---

[5]Joe testified she could have verified whether the criminal charges alleged against Jenkins were legitimate by performing a public records search which she had performed in the past.

Athens Police intimidate, harass and murder black residents on a daily basis." If it was the case, he stated he would have heard about it on television or in a newspaper.

After receiving the Clark Memorandum, Congressman Sessions attempted to learn if there was any truth to the allegation tying Charles Hawn, Sessions's only staff member in the Athens office, to the Ku Klux Klan.[6] Hawn received a call from a Dallas staff member asking if he had seen the Clark Memorandum. Sessions's Dallas office faxed the memorandum to Hawn for comment. Hawn indicated he had no association or knowledge of the BCJLO, Joe, or Clark. He had also never received any complaints from North Athens citizens about a pattern, or instance, of murder or intimidation of black residents by Athens police. He stated he absolutely had no ties to the Ku Klux Klan.

Sessions's office subsequently mailed the original Clark Memorandum to Mayor King and faxed him a copy for his comments. King provided a copy of the memorandum to Burton and Chief Vance. Burton arranged a meeting between King, Jenkins, and Vance to determine whether there was any substance to the charges against Jenkins in the Clark Memorandum. Jenkins was fingerprinted and criminal histories were run by the Athens

---

[6]Sessions testified by videotape that his office investigates constituents' complaints. The complaints are typically investigated by his local staff members and are generally carried out by interacting with people and asking questions. He also indicated this type of investigation is separate from his ability to participate in formal investigations initiated by Congress. He further testified Congressional Committees have the power to issue subpoenas and compel testimony but, as a Congressman investigating a constituent's complaint, Sessions had no subpoena power and could only effectuate change through informal methods.

Police Department and the Texas Rangers. Neither found any criminal history. City Council members also received a copy of the Clark Memorandum, held an Executive Session to discuss its contents and determine what action, if any, the Council should take. The Council decided against taking action.

On February 23, 2003, Jenkins filed this suit against Clark and BCJLO for damages due to defamation and libel. Jenkins's claims were tried to a jury and after a two day trial, the jury returned a verdict against Clark and BCJLO. Jenkins was awarded $300,000 for past and future damages due to mental anguish, injury to character and/or reputation and injury to her standing in the community. She was also awarded exemplary damages of $100,000 against Clark and $100,000 against BCJLO.

At trial, the jury was given the following instruction on the "actual malice" element of Jenkins's cause of action, and they made the following findings:

Question No. 2

Do you find by clear and convincing evidence that Paul Martin Clark and/or Black Citizens for Justice, Law and Order, Inc. acted with actual malice in committing the libel, if any, against Gladys Elaine Blanton Jenkins?

a. Paul Martin Clark               Yes
b. BCJLO                           Yes

Instruction: Actual malice means the false statement was made with actual knowledge that it was false or with reckless disregard of whether it was false. Reckless disregard means the author actually entertained serious doubts as to the truth of the statement.

"Clear and convincing evidence" which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.

## Discussion

Clark and BCJLO[7] contend Jenkins failed to present clear and convincing evidence of actual malice to controvert the testimony of Clark and Joe that the truth or falsity of the statements in the Clark Memorandum was never considered. Because Clark never considered whether the statements were true or false, he maintains he could not have entertained *any* doubts as to their truth or falsity. He also asserts his statements were absolutely privileged as a legitimate attempt to petition the government for a redress of grievances under the Texas Constitution article 1, § 27. As such, he would have this Court find his statements are not subject to Texas defamation laws.

Notwithstanding the order in which Clark briefed his issues, logic dictates that we first consider whether his statements are absolutely privileged before proceeding to consider the sufficiency of evidence of actual malice.

---

[7]In its answer to Question No. 3, the jury found BCJLO either authorized, or ratified, Clark to commit libel against Jenkins. The jury also found Clark and BCJLO jointly and severally liable for the actual damages of $300,000, and individually liable for their share of exemplary damages, $100,000 each. Neither Clark nor BCJLO raise any issue related to their joint liability nor the jury award of exemplary damages. They also filed a joint notice of appeal. Accordingly, in our Discussion, we will refer to "Clark and BCJLO" collectively as "Clark."

### I.      Right To Petition

### A.      Absolute Privilege

Clark asserts the statements in his memorandum are subject to an absolute privilege because the Texas Petition Clause provides greater protection for communications made in petitions for redress than exist for those who generally exercise their right to free speech.  He contends the Free Speech and Petition Clauses establish separate and distinct constitutional rights, the violation of which requires differing standards for determining liability in defamation actions.  Rather than permit plaintiffs to recover for defamation against a petitioner for redress if they establish "actual malice" under the *New York Times* standard[8] in accord with the United States Supreme Court's holding in *McDonald v. Smith*,[9] Clark would have this Court adopt the *Noerr-Pennington* doctrine created by the United States Supreme Court for use in antitrust cases,[10] and require such plaintiffs to establish the petition itself is a "sham" before liability attaches.  In sum, Clark urges this Court to elevate communications under the Petition Clause to "special" First Amendment status and accept his claim of absolute privilege.

---

[8]*New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

[9]472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985).

[10]*Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

The Petition Clause of the Texas Constitution reserves the right to petition the government for a redress of grievances as follows:

> RIGHT OF ASSEMBLY; PETITION FOR REDRESS OF GRIEVANCES. The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those vested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance.

Texas Const. art. 1, § 27.[11]

Contrary to Clark's assertion, the right to petition is inseparable from the right of free speech. *Puckett v. State*, 801 S.W.2d 188, 192 (Tex.App.–Houston [14th Dist.] 1990), *cert. denied,* 502 U.S. 990, 112 S.Ct. 606, 116 L.Ed.2d 629 (1991). "Although the rights are distinct guarantees, they were cut from the same constitutional cloth, inspired by the same principles and ideals. Thus, as a general rule, the rights are subject to the same constitutional analysis." *Id.* (citations omitted).

That the Texas Constitution expressly guarantees a right to bring suits for reputational torts and provides access to courts for injuries to reputation, supports the

---

[11]Unlike the Texas Constitution, the federal counterpart combines the right to freedom of speech with the right to assemble and petition for redress as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. 1.

12

notion that First Amendment speech safeguards should apply to those who petition for redress.[12] Nowhere in the Petition Clause is there language that militates against applying these free speech safeguards to petitioners, or that supports any "special" First Amendment status for petitioners.[13] Rather, defamation defendants seeking greater protection than that offered by the Texas and United States Constitutions must look to Texas common law. The Texas Supreme Court has observed:

> [a]lthough we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee, we have also recognized that 'broader protection, if any, cannot come at the expense

---

[12]In fact, the Framers of the Texas Constitution first considered an absolute guarantee of free speech and subsequently adopted a provision making communicators responsible for an abuse of the right to free speech. The Texas Supreme Court in *O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex. 1988), observed:

> [t]he original draft of section 4 of the Declaration of Rights of the 1836 Constitution for the Republic of Texas provided: 'No law shall ever be passed to curtail the liberty of speech or the press.' 1 Gammel, Laws of Texas 868 (1898). But, by the time of its adoption the Fourth Declaration of Rights of the Texas Constitution of 1836 stated: 'Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, *being responsible for the abuse of that privilege.*

Emphasis added.

[13]When interpreting the Texas Constitution, we "rely heavily on its literal text and must give effect to its plain language." *Stringer v. Cendant Mortgage Corp.*, 23 S.W.3d 353, 355 (Tex. 2000); *Republican Party of Tex. v. Dietz*, 940 S.W.2d 86, 89 (Tex. 1997). Clark contends the three words–"or other purposes"–somehow expands the Petition Clause to protect statements by petitioners with an "absolute privilege." However, we interpret these three words as modifying the phrase "for redress of grievances" to include petitions for "purposes other" than the "redress of grievances." The phrase "or other purposes" does not speak or relate to the granting of any special privileges or protections for those who exercise their rights under the Petition Clause.

13

of a defamation claimant's right to redress.' Unlike the United States Constitution, the Texas Constitution expressly guarantees the right to bring reputational torts. The Texas Constitution's free speech provision guarantees everyone the right to 'speak, write or publish his opinions on any subject, *being responsible for abuse of that privilege.'* Likewise, the Texas Constitution's open courts provision guarantees that '[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or *reputation*, shall have remedy by due course of law.' While we have occasionally extended protections to defamation defendants greater than those offered by the United States Constitution, we have based these protections on the common law, not the Texas Constitution.

*Bentley v. Bunton,* 94 S.W.3d 561, 578 (Tex. 2003) *quoting Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 116-17 (Tex. 2000) (emphasis in original).

Thus, unless Texas common law creates an exception, persons who exercise their right to petition do so in the absence of absolute immunity and may be held liable for their communications if the plaintiff is able to make a showing sufficient to satisfy the *New York Times* standard for "actual malice." We also find the United States Supreme Court's holding in *McDonald v. Smith,* persuasive and agree that, although "[t]he right to petition is guaranteed, the right to commit libel with impunity is not." 472 U.S. at 485, 105 S.Ct. at 2790.

In *McDonald*, the plaintiff was a candidate for appointment as a United States Attorney. The defendant sent defamatory letters to various federal governmental officials, including President Reagan, concerning the plaintiff's ethical qualifications to serve as United States Attorney. Based upon those communications, the plaintiff sued for defamation. The defendant argued the Petition Clause of the First Amendment, which

14

guarantees "the right of the people . . . to petition the Government for a redress of grievances," should provide him with absolute immunity. *Id.* The Court disagreed, noting that "[u]nder state common law, damages may be recovered only if [the defendant] is shown to have acted with malice . . . ." *Id.* The Court held that requiring plaintiffs to show actual malice was sufficient protection for petitioners, and "the Petition Clause does not require the State to expand this privilege into an absolute one." *Id.*

The *McDonald* ruling is compatible with Texas common law which recognizes two classes of privileges -- absolute and qualified -- either of which may apply to a petition for redress. Two cases are illustrative. In *Koehler v. Dubose*, 200 S.W. 238 (Tex.Civ.App.–San Antonio 1918, writ ref'd), the court considered allegations of libel contained in letters addressed to the state comptroller related to the issuance of a new liquor license to the plaintiff. The letters accused the plaintiff of selling alcohol to minors through others and petitioned the state comptroller, who had authority to grant, revoke, or refuse licenses to sell intoxicating liquor, to refuse to issue a new license. The court recognized that, under the common law, there were two classes of privilege that might apply to petitioners' communications -- absolute and qualified. *Id.* at 242. After finding the letters were not part of a judicial proceeding and subject to an absolute privilege, the court found the communications were subject to a qualified privilege and stated, "the publishers of the statements will be guilty of libel if it be shown that the accusations were made in bad faith and with malice towards appellant." *Id.* at 243.

15

In *Connellee v. Blanton*, 163 S.W. 404 (Tex.Civ.App.–Fort Worth 1913, writ ref'd)*,* the court extended the absolute privilege recognized under the common law for statements made in judicial proceedings to petitions to the Governor requesting pardons. In *Connellee*, plaintiff's petition, a letter applying to the Governor for a pardon, complained that a district judge had changed the venue of the defendant's case for the purpose of making the costs excessive. *Id*. at 405. The *Connellee* court also recognized two classes of privilege, qualified and absolute, that might apply but determined the petition was subject to an absolute privilege because it was an extension of the judicial proceedings whereby the person sought to be pardoned was convicted. *Id.* at 407. The *Connellee* court held:

> [t]he same principle of public policy which supports the absolute privilege extended to judicial proceedings applies with equal force in favor of petitions to the Governor of the state for the exercise of the pardoning power, a power superior to that of the court which rendered the judgment of conviction. If the judicial proceedings which culminated in the conviction were absolutely privileged, why should not the same immunity be extended to the petition to a higher power to annul that judgment, in part?

*Id.*

Thus, the courts' rulings in *Koehler* and *Connellee* on the issue of whether a petition is subject to an absolute or qualified privilege under the common law turned on whether the petition was submitted in connection with a judicial proceeding. The *Koelher* court recognized the principle that, at a minimum, all petitions are subject to a qualified privilege under the common law, and *Connellee* recognized an absolute privilege where the petition

16

is submitted as an extension of a judicial proceeding.[14]   Neither court recognized an

absolute privilege for all communications under the Petition Clause.[15]

Accordingly, when a person exercises their constitutional right to petition for redress,

their communications may be subject to an absolute privilege or qualified privilege

depending on the context, or occasion, in which their communication is made. *See*

*Koehler, 200 S.W.* at 242-43.  An absolute privilege is analogous to an immunity because

absolutely privileged communications are not actionable and may not form the basis for

civil liability, *Reagan v. Guardian Life Ins., Co.,* 140 Tex. 105, 166 S.W.2d 909, 911 (1942);

---

[14]*Hott v. Yarbrough*, 245 S.W. 676 (Tex.Comm'n App. 1922, judgm't adopted), also cited by Clark, is similar to *Connellee.*   In *Hott,* the court held that the contents of a letter to a grand jury foreman were absolutely privileged because communications to the grand jury in the regular performance of its duties were subject to the common law rule applicable to judicial proceedings.   *Id.* at 678.  That the *Hott* court cites to a Vermont Supreme Court case, *Harris v. Hunnington,* 2 Tyl. 129, 1802 WL 777, (Vt. 1802),  for a general discussion of the scope of absolute privileges is not persuasive authority that the *Hott* court intended to extend an absolute privilege to all petitioners.  In *Harris*, the Vermont Supreme Court extended an absolute privilege to a petition addressed to the Vermont Legislature asking the legislative convention not to reappoint a particular Justice of the Peace.  In *Harris,* the Vermont House of Representatives was empowered by its Constitution to impeach state criminals and acted as the "grand inquest of the State to charge such criminals." As such, the Vermont Legislature acted in a capacity similar to that of a grand jury determinating whether to issue indictments.

[15]*Wood v. State*, 577 S.W.2d 477 (Tex.Crim.App. 1978), also cited by Clark, is anomalous.  In *Wood,* the defendant challenged the constitutionality of the Penal Code provision making it a crime to file a false police report under the Petition Clause.  The officer who was the subject of her complaint did not bring an action for defamation. Moreover, the court decided the case on the sufficiency of the evidence under the Penal Code provision making it a crime to file a false police report, ignored any constitutional issues, and tied its ruling to the case.  *Id*. at 480 n.2.

*Randolph v. Walker*, 29 S.W.3d 271, 278 (Tex.App.–Houston [14[th] Dist.] 2000, pet. denied), even though the communication is false and published with express malice. *Associated Telephone Directory Publishers, Inc. v. Better Business*, 710 S.W.2d 190, 192 (Tex.App.–Corpus Christi 1986, writ ref'd. n.r.e.). This privilege attaches to communications made in proceedings of legislative, executive, and judicial bodies, *Zarate v. Cortinas*, 553 S.W.2d 652, 654 (Tex.Civ.App.–Corpus Christi 1977, no writ), and to only a limited and select number of situations which involve the administration of the functions of the branches of government such as the opinions of judges and the speeches of members of congress or legislatures. *Hurlbut v. Gulf Atlantic Life Insurance Co.,* 749 S.W.2d 762, 768 (Tex. 1987); *Knapp & Co. v. Campbell,* 36 S.W. 765, 767 (Tex.Civ.App.–El Paso 1896, no writ).

Absolute privilege attaches to all communications published in the course of judicial proceedings, *IBP, Inc. v. Klumpe,* 101 S.W.3d 461, 470 (Tex.App.–Amarillo 2001, pet. denied), and similarly applies to quasi-judicial proceedings before executive officers, boards, or commissions. *Reagan,* 166 S.W.2d at 912; *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 256-57 (Tex.App.–Fort Worth 2004, pet. denied). To apply, the executive officer, board, or commission must exercise quasi-judicial powers. *Putter v. Anderson*, 601 S.W.2d 73, 76 (Tex.Civ.App.–Dallas 1980, writ ref'd. n.r.e.). That is, the governmental entity must have the authority to investigate and decide the matters at issue, *5-State Helicopters, Inc.,* 146 S.W.3d at 259; *Crain v. Smith*, 22 S.W.3d 58, 60-61 (Tex.App.–Corpus Christi 2000, no pet.); *Lane v. Port Terminal R.R. Ass'n*, 821 S.W.2d

18

623, 625 (Tex.App.–Houston [14th Dist.] 1991, pet. denied), and the communication must bear some relationship to a pending or proposed judicial proceeding in order for the absolute privilege to apply. *Bennett v. Computer Assocs. Int'l., Inc.,* 932 S.W.2d 197, 201 (Tex.App.–Amarillo 1996, writ denied).[16]

Clearly, all communications to public officials are not absolutely privileged. *Hurlbut*, 749 S.W.2d at 768. Initial communications "to a public officer . . . who is authorized or privileged to take action" are subject to only a qualified privilege, not absolute immunity. *Id.* The filing of a criminal complaint is not absolutely privileged because, at that point, no judicial proceedings have been proposed and no investigating body has discovered sufficient information to present to a grand jury or file a misdemeanor complaint. *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 99 (Tex.App.–San Antonio 2003, pet. denied). *See Caller Times Pub. Co. v. Chandler,* 122 S.W.2d 249, 251 (Tex.Civ.App.–San Antonio 1938), *aff'd,* 130 S.W.2d 853 (Tex. 1939) (confessions under oath to a district attorney implicating plaintiff in the commission of a crime not absolutely privileged); *Houston Chronicle Pub. Co. v. Tiernan,* 171 S.W. 542, 546 (Tex.Civ.App.–Galveston 1914, no writ) (affidavits alleging attorneys committed crimes were not absolutely privileged). Thus, the initial communication of alleged wrongful or illegal acts to an official authorized

---

[16]Examples where the privilege has been held to apply include statements made in correspondence sent, and conferences convened, in anticipation of litigation; in pretrial hearings, depositions, affidavits, pleadings or papers filed in the case; pleadings delivered to the media and settlement letters sufficiently connected with a pending or potential suit. *Bennett,* 932 S.W.2d at 201.

19

to protect the public from such acts is subject to a qualified privilege. *See Hurlbut*, 749 S.W.2d at 767-68 (criminal allegations made to assistant attorney general not absolutely privileged); *Zarate,* 553 S.W.2d at 655.

This common law "qualified privilege" has been described as follows:

> [q]ualified privileges against defamation exist at common law when a communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication. *See Holloway v. Texas Medical Ass'n,* 757 S.W.2d 810, 813 (Tex.App.–Houston [1st Dist.] 1988, writ denied). A communication may also be conditionally privileged if it affects an important public interest. *See generally* Bruce W. Sanford, Libel and Privacy, at 701-94.1 (collecting libel privilege statutes from all fifty states).

*Cain v. Hearst Corporation,* 878 S.W.2d 577, 582 (Tex. 1994).

Unlike an absolute privilege, this "conditional privilege is defeated when the privilege is abused," *Hurlbut*, 749 S.W.2d at 768, and the "qualifying criterion . . . is that the statements must be made in good faith and without malice." *Zarate,* 553 S.W.2d at 655 (collected cases cited). To hold otherwise would "unnecessarily deny those innocent victims of maliciously or recklessly filed complaints an opportunity to seek remuneration for their injury." *Id.* In making a determination whether statements are subject to a qualified privilege, courts must examine the "occasion" of the communication, *i.e.,* the totality of the circumstances including the communication itself, its communicator, its recipient and the relief sought. *Cranfill v. Hayden,* 55 S.W. 805, 809 (Tex.Civ.App.–Dallas

20

1900, no writ).[17] And, the question of privilege is ordinarily one of law for the court. *Denton Publishing Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex. 1970).

Clark addressed his Memorandum to Congressman Sessions and DOJ's Civil Rights Division. By his Memorandum, Clark generally sought to instigate an investigation of alleged civil rights violations in Athens and, more specifically, Jenkins's immediate removal from the Athens City Council. As such, the Clark Memorandum was a preliminary report, not communicated to Congressman Sessions as part of a legislative proceeding. Moreover, Congressman Sessions lacked the subpoena power necessary to conduct a formal investigation as well as the authority to grant the ultimate relief sought by Clark. At best, the Congressman could make calls, gather information, and refer Clark's allegations to public officials and/or agencies empowered to investigate, litigate, or adjudicate Clark's complaints. Congressman Sessions's ability to gather information and refer matters to the appropriate authorities does not constitute a "legislative proceeding." *See Belo v. Wren,* 63 Tex. 686, 1884 WL 8996, *26-27 (Dec. 19, 1884). Thus, Clark's statements to Congressman Sessions were not part of a legislative proceeding and were not subject to an absolute privilege. Neither were Clark's statements to DOJ's Civil Rights Division communicated in an executive, judicial, or quasi-judicial proceeding.

---

[17]This is an objective test. Whether Clark and/or Joe "believed" that Sessions and/or DOJ were under a duty to keep their communications confidential or their communications were absolutely privileged, is irrelevant. We also note the Memorandum contains no language, legends, or banners indicating the information contained therein was, or should be treated as, confidential.

A privilege "is an affirmative defense to be proved and is in the nature of confession and avoidance." *IBP, Inc.,* 101 S.W.3d at 471. As such, Clark had the burden of establishing this affirmative defense to defamation. *Id.* Clark produced no evidence indicating DOJ was actively contemplating, investigating, or litigating any civil rights violations related to Athens. In addition, Clark's allegations were preliminary in nature, *i.e.,* designed to launch an investigation that might lead to legal action. Thus, Clark's statements to DOJ were not part of an executive, judicial, or quasi-judicial proceeding, and were not subject to an absolute privilege.

Under Texas common law, damages for defamation and libel may be recovered only if a defendant is shown to have acted in bad faith with malice. *Zarate,* 553 S.W.2d at 655; *Koehler*, 200 S.W. at 243. This standard is consistent with that expressed by the United States Supreme Court in *New York Times, supra,* and is applicable to a plaintiff's claims against those who have exercised their First Amendment right under the Petition Clause. *McDonald,* 472 U.S. at 485, 105 S.Ct. at 2791. *See generally Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240, 242 (Tex. 1980); *Little v. Bryce,* 733 S.W.2d 937, 945 (Tex.App.–Houston [1st Dist.] 1987, no writ]. While we recognize the Petition Clause is undoubtedly an important part of self-government, one person's right to petition, in the absence of a common law privilege that is absolute, ends where his neighbor's reputational rights begin. Like the *McDonald* court, we are not prepared to conclude that the Petition Clause "include[s] an unqualified right to express damaging falsehoods in exercise of that right." *472 U.S.* at 484, 105 S.Ct. at 2790.

22

We also decline to apply the "sham exception" doctrine established by the United States Supreme Court for antitrust litigation, *i.e.,* the *Noerr-Pennington* doctrine. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 379-80, 111 S.Ct. 1344, 1353-54, 113 L.Ed.2d 382 (1991). The *Noerr-Pennington* doctrine basically holds that petitioning the government to take anticompetitive action does not violate antitrust laws. *Id.* The *Omni* court described the doctrine as follows:

> [a] classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay.

*Id.*

The *Noerr-Pennington* doctrine has no application here. Jenkins filed suit for defamatory statements made in a memorandum intended to instigate an investigation by the federal government and thereby result in her removal from office. Jenkins did not sue Clark for improperly attempting to influence governmental decision-making or obtain an unlawful economic result, *i.e.,* anticompetitive action. We recognize, as did the *Omni* Court, that the *Noerr-Pennington* doctrine is "tailored . . . for the business world," *id.,* and find the United States Supreme Court's holding in *McDonald* to be apropos.[18] Having

---

[18]Likewise, *United States v. Hylton*, 558 F.Supp. 872 (D.C. Tex. 1982), *aff'd*, 710 F.2d 1106 (5th Cir. 1983), is of no assistance to Clark's appeal. In *Hylton*, the defendant sought an acquittal on federal charges of attempting to intimidate and impede an IRS investigation. After defendant filed a criminal complaint against two IRS agents, the IRS filed an action claiming defendant filed her complaint intending to obstruct an IRS investigation rather than assert her own rights. *Id.* at 874. No one alleged a claim for

concluded the statements in the Clark Memorandum are subject to a qualified privilege permitting liability in a defamation action if his statements were made with actual malice, we may now consider his contention that Jenkins failed to prove actual malice by clear and convincing evidence

## II.     Actual Malice

A public figure may not recover damages for a defamatory falsehood without clear and convincing proof the false statement was made with "actual malice," *i.e.,* with knowledge the statement was false or with reckless disregard of whether it was false or not. *Doubleday & Co., Inc. v. Rogers*, 674 S.W.2d 751, 755 (Tex. 1984); *New York Times Co.,* 376 U.S. at 279-280, 84 S.Ct. at 726. Although a bright line definition of "clear and convincing evidence" for purposes of determining actual malice does not exist, the phrase has been used to mean evidence which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations to be established, or evidence sufficient to support a firm conviction that the fact to be proved is true. *Bentley,* 94 S.W.3d at 596-97; *Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413, 422 (Tex. 2000).

Knowledge that the statement is false is a "relatively clear standard; reckless disregard is much less so." *Bentley,* 94 S.W.3d at 591. Reckless disregard is a subjective

defamation. Rather, the IRS alleged the defendant attempted to utilize legal processes to attain an improper result. Here, Jenkins does not assert Clark improperly petitioned Congressman Sessions and DOJ, but that Clark defamed Jenkins in the process.

24

standard focusing on the declarant's belief in, or attitude toward, the truth of the communication at issue. *New Times v. Isaacks*, 146 S.W.3d 144, 165 (Tex. 2004). The standard requires more than a departure from conduct that is reasonably prudent. Mere negligence is not enough. *Bentley,* 94 S.W.3d at 591. There must be evidence the defendant made the false publication with a high degree of awareness of probable falsity, or entertained serious doubts as to the truth of his publication. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 2686, 105 L..Ed.2d 562 (1989). For instance, a failure to investigate by itself does not evidence a reckless disregard for the truth, but evidence that a failure to investigate was contrary to the speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard necessary for a finding of actual malice. *Bentley,* 94 S.W.3d at 591.

While recognizing that the test for reckless disregard "may be said to put a premium on ignorance, encourage the irresponsible publisher not to inquire, and permit the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity," *St. Amant v. Thompson,* 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), the United States Supreme Court has cautioned that:

> [t]he defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his

25

imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*Id.*

In addition, although courts must be careful not to place too much reliance on factors such as motive, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence. *Bentley,* 94 S.W.3d at 591; *Harte-Hanks,* 491 U.S. at 668, 109 S.Ct. at 2685. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. *Bentley,* 94 S.W.3d at 596. Moreover, although an understandable misinterpretation of ambiguous facts does not show actual malice, inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 638 (Tex. 2005). Actual malice may be inferred from the "relation of the parties, the circumstances attending the publication, the terms of the publication itself, and from the defendant's words or acts before, at, or after the time of the communication." *Dolcefino v. Turner*, 987 S.W.2d 100, 111-12 (Tex.App.–Houston [14ᵗʰ Dist.] 1998), *aff'd,* 38 S.W.3d 103 (Tex. 2000).

In *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the United States Supreme Court held that judges have a constitutional duty to "exercise independent judgment and determine whether the record

26

establishes actual malice with convincing clarity" in defamation suits brought by public officials. 466 U.S. at 514, 104 S.Ct. at 1967. In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full, *Harte-Hanks,* 491 U.S. at 688, 109 S.Ct. at 2696, and determine whether the evidence in the record is sufficient to support a finding of actual malice as a matter of law. *Bentley*, 94 S.W.3d at 597-98.

In making credibility determinations the reviewing court must make an independent examination of the statements at issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect. *New York Times Co.,* 376 U.S. at 285, 84 S.Ct. at 728-29. Where the credibility of witnesses is a factor in determining whether the constitutional standard has been satisfied, "the First Amendment does not forbid any deference to a fact finder's determinations; it limits that deference." *Bentley*, 94 S.W.3d at 598.[19] The findings the jury

[19]In *Bentley*, the Texas Supreme Court observed:

> [i]f the First Amendment precluded consideration of credibility, the defendant would almost always be a sure winner as long as he could bring himself to testify in his own favor. His assertions as to his own state of mind, if they could not be disbelieved on appeal, would surely prevent proof of actual malice by clear and convincing evidence absent a 'smoking gun'–something like a defendant's confession on the verge of making a statement that he did not believe it to be true. The First Amendment does not afford even a media defendant such protection.

94 S.W.3d at 597.

must have made to reach its verdict are considered alongside the undisputed evidence to determine whether the plaintiff has met its burden of proof on the element of actual malice. *Harte-Hanks,* 491 U.S. at 690-91, 109 S.Ct. at 2678.

Thus, we follow the approach set forth in *Bentley* and *Harte-Hanks.* First, we begin with a determination of the evidence the jury must have found incredible. *Bentley*, 94 S.W.3d at 599. If the fact finder chose to disregard the defendant's testimony, so must we, so long as the jury's credibility determinations are reasonable. *Id.* However, "it is not enough for the jury to disbelieve defendant's testimony," *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989), the credible evidence must rise to the level of clear and convincing. *Bentley,* 94 S.W.3d at 599. Thus, once we have resolved credibility determinations in favor of the jury's verdict, we must independently evaluate the statements at issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect. *Turner,* 38 S.W.3d at 120. We then identify the undisputed facts and make a determination whether the "undisputed evidence along with any other evidence that the jury could have believed provides clear and convincing proof of actual malice." *Bentley*, 94 S.W.3d at 599.

**A. Evidence The Jury Found Not Credible**

The jury's finding that Clark acted with actual malice does not differentiate whether Clark had actual knowledge the statements regarding Jenkins were false or acted with reckless disregard of whether the statements were false, but we know, based upon the

28

definition of actual malice given to the jury, that it was one or the other. That said, the jury's finding supports an inference that the jury believed, by clear and convincing evidence, that Clark either knew the statements were false, or he actually entertained serious doubts as to the truth of the statements.

Neither Clark nor Joe offered any evidence that they believed the statements were true or made in good faith at the time they were published.[20] Rather, Clark and Joe testified the statements were published without a point of reference that would assist them in determining the veracity of their sources or the truthfulness of the statements about Jenkins, and performed no investigation to determine the accuracy of the information.

In essence, Clark testified he was just a scrivener. He stated he simply wrote down, or recorded, what was said by the attendees at the Council meeting and gathering afterwards. He had no belief or disbelief as to the truth of the statements contained in his Memorandum. He had no basis for believing or disbelieving the speakers at the meeting. If the jury determined Clark knew the statements were false, Clark's testimony must be ignored. *Bentley*, 94 S.W.3d at 599. To the extent the jury determined that Clark actually

---

[20]Clark contends that Congressman Sessions's testimony supports a finding that Clark acted in good faith. Although Sessions testified that he believed Clark acted in good faith, he also testified he read only the portion of the Clark Memorandum in which he and his office were named; he believed he had met Clark briefly once; and he could not testify whether Clark acted in good faith in connection with his involvement in Athens in November 2002. Congressman Sessions's testimony regarding Clark's good faith is equivocal at best and largely irrelevant because the actual malice test is a subjective one that focuses on the defendant's state of mind. *See New Times*, 146 S.W.3d at 162; *Bentley*, 94 S.W.3d at 591.

entertained serious doubts as to the truth of the statements, his testimony must also be ignored. *Id.*

Clark also identified Barbara Bowman as a person at the after-meeting who told him Jenkins was a convicted felon and served time in Texas and California for prostitution and drugs. To the contrary, Barbara Bowman testified at trial in the plaintiff's case-in-chief that Fred Burke told Clark that Jenkins had engaged in drugs and prostitution in California, but said nothing about Texas, Jenkins serving time in prison, or being convicted. Bowman unequivocally testified no one at the meeting accused Jenkins of being a convicted felon. Clark did not appear at trial. Rather, Clark's deposition testimony was read. Neither did Clark's counsel call Burke to testify. Given the jury's finding regarding actual malice, we ignore Clark's testimony and find the jury determined Bowman's testimony to be credible.

## B.     The Clark Memorandum

The Clark Memorandum falsely stated that Jenkins was "a convicted felon having served prison time in Texas and California for Prostitution and Drugs." The Memorandum was addressed to a United States Congressman and DOJ's Civil Rights Division. Based upon this statement, Clark unequivocally demanded Jenkins "be removed from office immediately."

The law does not allow someone the unrestricted right to publish statements about public officials that are untrue, and in upholding this principle the courts of this State have

held that, "[a]s a general rule a publication concerning a public officer, in order to be libelous per se, must be of such a character as, if true, would subject him to removal from office." *Fitzjarrald v. Panhandle Publishing Co.*, 149 Tex. 87, 228 S.W.2d 499, 503 (1950); *Rawlins v. McKee*, 327 S.W.2d 633, 637 (Tex.Civ.App.–Texarkana 1959, writ ref'd. n.r.e.) (collected cases cited therein); *see* 50 Tex.Jur. 3d *Libel and Slander* §34 (2000); *Marshal v. Mahaffey,* 974 S.W.2d 942, 949 (Tex.App.–Beaumont 1998, pet. denied); *Houston Chronicle Pub. Co. v. Flowers,* 413 S.W.2d 435, 438 (Tex.Civ.App.–Beaumont 1967, no writ). Libel *per se* means the written or printed words are so obviously hurtful to the person aggrieved that they require no proof of their injurious character to make them actionable. *Morrill v. Cisek*, 226 S.W.3d 545, 549-50 (Tex.App.–Houston [1st Dist.] 2006, no pet.).

Having considered the statement in issue and the circumstances under which it was made, we find that the Clark Memorandum is not of a character that should receive protection under the principles of the First Amendment. "The Constitution seeks to secure liberty and not licentiousness." *Koehler*, 200 S.W. at 244.

### C. Clear and Convincing Proof of Actual Malice

A plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence. *Bentley,* 94 S.W.3d at 591; *Harte-Hanks,* 491 U.S. at 668, 109 S.Ct. at 2685. In general, the Texas and United States Supreme Courts recognize three types of circumstantial evidence that would likely support a finding of actual malice: (1) where a story is fabricated by the defendant, is the product of his imagination, or is based wholly

31

on an unverified, anonymous account; (2) when the allegations made are so inherently improbable that only a reckless man would have put them in circulation; and (3) there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. *Bentley,* 94 S.W.3d at 596; *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. The Clark Memorandum must also be construed as a whole, in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *See Turner*, 38 S.W.3d at 114; *Wood v. Dawkins*, 85 S.W.3d 312, 317 (Tex.App.–Amarillo 2002, pet. denied).

Our analysis begins with the origination of the Clark Memorandum. Clark testified he took notes at the after-meeting and simply recorded what the attendees stated. He testified that everything in his Memorandum originated with statements people made at the after-meeting. Clark also testified he was trained as a federal records management officer to objectively record events, and Joe testified Clark was sent to Athens because of his detailed note-taking abilities. Furthermore, Clark testified he had no belief or disbelief regarding his statement about Jenkins.

We have already determined that the jury's answer to the charge indicates that they disbelieved Clark's testimony that he had no belief or disbelief as to the truth or falseness of his statement about Jenkins and that they could have believed Bowman's testimony that Clark did not learn all of the information contained in his statement about Jenkins at the after-meeting. Therefore, relying on Bowman's testimony and Clark's testimony that his

32

information came *only* from statements at the after-meeting, the jury could have inferred he "made up" or "imagined" the facts underlying his statement related to Jenkins. We find this inference reasonable and supported by the evidence.

Clark and Joe testified Clark was dispatched to Athens to take notes of what transpired and draft a memorandum to prompt an investigation by Congressman Sessions and DOJ. The Clark Memorandum is clearly an "action" memorandum, *i.e.,* an advocacy document designed not only to prompt an investigation, but to remove Jenkins from office immediately. Nowhere in the Memorandum are the facts or information described as merely the recordation of statements made during meetings of Athens's city government or its concerned citizens. Rather, Clark describes himself as an eyewitness in attendance at the City Council workshop and, with the exception of one paragraph,[21] his factual recitations and opinions are wholly unqualified. The Clark Memorandum's authoritative tone, unqualified language, use of the first person, formal format, and author's signature line, give the appearance Clark is writing with some command of the facts underlying his discrimination claims. Regardless whether Clark was simply a note-taker at the Athens

---

[21]In paragraph three of the Clark Memorandum, Clark qualifies his accusation that the staff of Congressman Sessions's Athens office have ties to the Ku Klux Klan with the statement–"there is a perception on the part of these citizens that . . . ." This qualification indicates Clark at least considered the need to qualify certain language in the Memorandum and either believed additional qualification was unnecessary or chose not to qualify other statements.

meetings, when he returned to Dallas and drafted the memorandum, he plainly became an advocate for an investigation in Athens and Jenkins's removal from office.[22]

Moreover, there was substantial testimony at trial that a significant number of additional allegations in the Clark Memorandum were untrue and Clark's "eyewitness account" of the City Council workshop was a gross misrepresentation of the events that transpired.[23] The uncontroverted testimony indicated it was not true that: black people were being murdered on a daily basis in Athens; a black man was killed by the Athens police some three weeks prior to the Clark Memorandum; a black woman was tortured by the Athens Police Department and denied medical care; Vance was at the helm of the Garland Police Department when a racial incident occurred; Athens recruited its new police chief because of his racist credentials; peaceful picketing was not allowed in Athens; and picketers were harassed.

Regarding Clark's "eyewitness account" of what transpired at the City Council workshop, the uncontroverted testimony indicated it was not true that the Mayor told *only*

---

[22]Regardless whether the jury found Joe's testimony related to the coverpage credible, the test for "actual malice" focuses on Clark's "belief in, or attitude toward, the truth of the communication at issue." Accordingly, we focus on Clark's subjective belief at the time he made the statements, not Joe's subsequent actions.

[23]At trial, Jenkins produced a number of witnesses that corroborated her evidence: Charles Hawn (regional district office manager for Congressman Sessions), Pam Burton (Athens City Administrator), Elaine Jenkins (City Council person and plaintiff), and Jerry King (former Mayor of Athens). Clark did not appear at trial and did not call any members of the CCNA or other witnesses who attended the City Counsel workshop or after-meeting to rebut the testimony of Jenkins's witnesses.

34

black people to leave the meeting; the Mayor vented extreme hatred by telling the black attendees he did not appreciate the attendance of outsiders; black citizens were refused copies of the minutes of the meeting; the workshop never took place and was a mere future agenda item; only three people were allowed to speak at the workshop; workshop only lasted nine minutes; and black citizens were told to meet with the new police chief individually, not as a group.

Thus, the uncontroverted evidence indicates Clark purposefully drafted an incendiary instrument designed to prompt an investigation in Athens and remove Jenkins from office. Given the gross discrepancies regarding Clark's account of what transpired at the City Council workshop and apparently false allegations and statements contained in his Memorandum, a jury could readily infer that Clark misrepresented facts and stated false allegations and opinions in order to attain his predetermined goals. This includes embellishing Burke's allegations related to Jenkins to include convictions as well as imprisonment in multiple states. *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (deliberate alteration of a statement resulting in a material change in the meaning conveyed by the statement is proof of reckless disregard); *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 253, 95 S.Ct. 465, 470-71, 42 L.Ed.2d 419 (1974) (where reporter fabricated and imagined false facts for purposes of bolstering theme of feature article, jury was "plainly justified" in finding that reporter portrayed the Cantrells in a false light through knowing or reckless untruth); *Carson v. Allied News Company*, 529 F.2d 206, 213 (7th Cir. 1976) (defendants, in

35

fabricating and imagining facts, necessarily entertained serious doubts as to the truth of the statements and had a high degree of awareness of their probable falsity).

In reaching our conclusion, we find two cases instructive. In *Cantrell*, a reporter was writing a feature article discussing the impact upon a family whose father died in a well-documented bridge collapse. 419 U.S. at 247, 95 S.Ct. 467. The reporter visited the Cantrell's residence where he interviewed Cantrell's children. Although Mrs. Cantrell was not at home, his article contained a description of her demeanor as well as a statement attributed to her. The article also contained significant misrepresentations pertaining to the dilapidated state of the Cantrell home and their poverty condition. Based upon these facts, the *Cantrell* Court affirmed a jury finding and appellate determination that the reporter and his publisher had "published knowing or reckless falsehoods about the Cantrells." 419 U.S. at 252-53, 95 S.Ct. at 470.

In *Guam Federation of Teachers, Local 1581, of the American Federation of Teachers v. Ysrael*, 492 F.2d 438 (9th Cir. 1974), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974), the defendant caused various defamatory statements concerning a Union and its officers opposed to his appointment to a school board to be published in a newspaper. The court determined that the defendant's testimony at trial as an adverse witness was sufficient alone to get the plaintiffs to the jury under the *New York Times* standard and described his testimony as follows:

[h]e repeatedly admitted that he did not know whether what he said was true. He repeatedly admitted that he did nothing, or almost nothing, to verify his charges. As to most of his statements, he repeatedly admitted that he knew of no facts to support them; he either relied upon unspecified rumor or nothing at all. He simply asserted that he believed what he said was true.

*Id.* at 439.

Given the facts presented at trial, the jury could have reasonably inferred that Clark either falsely reported the information he received about Jenkins at the after-meeting, or imagined additional facts he was not told to further his purpose of seeking an investigation of her past activities or immediate removal from office. This inference is reasonable under circumstances where the Clark Memorandum itself is riddled with numerous other falsehoods, misrepresentations, and innuendoes designed to achieve his predetermined result.

Like the defendant in the *Guam Federation* case, Clark also repeatedly admits he did not know whether the statements related to Jenkins were true; he did nothing to verify the alleged criminal convictions and knew of no facts to support the statements. According to Clark, he relied on the word of complete strangers who were interested parties with whom he had no reference for determining the veracity of what they were telling him about a person he had never met. Although the defendant in *Guam Federation* at least testified he believed his statements to be true, Clark testified he had no belief, good faith or otherwise, in the truth of his statements about Jenkins. The behavior exhibited by Clark

is more than reckless disregard of the truth or falsity of the information he published – it is simply *no* regard.

Putting aside for a moment the evidence indicating Clark "made up" or "imagined" the information, the jury's verdict is also buttressed by the "inherently improbable" nature of the statements in the Clark Memorandum, *i.e.,* an elected, sitting official had earlier been convicted and imprisoned in two states for crimes related to drugs and prostitution. This is even more so where one of the crimes allegedly committed was in the very state where the person is serving office, and the validity of the claims could be easily determined by a public records search. *See Burger v. McGilley Memorial Chapels, Inc.,* 856 F.2d 1046, 1052 (8th Cir. 1988) (jury could find employer did not rely in good faith on employee's statement easily refutable either by confronting the former employee or making a simple check of the employer's records).

All this, in addition to Clark's departure from his training and past performance as a detailed, objective note-taker and the fact that Clark did not perform a simple public records check despite his apparent disbelief regarding the extreme allegations being made about the routine murder of black citizens in Athens coupled with the complete absence of any information regarding the veracity of his sources, provide more than adequate support for a finding of actual malice by clear and convincing evidence. *See Goldwater v. Ginsburg,* 414 F.2d 324, 337 (2nd Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970), *reh'g denied,* 397 U.S. 978, 90 S.Ct. 1085, 25 L.Ed.2d 274 (1970)

("[r]epetition of another's words does not release one of responsibility if the reporter knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports").

Clark asserts this case is most similar to *St. Amant v. Thompson*. In *St. Amant*, a candidate for public office, the defendant, St. Amant, made a televised speech in which he quoted a statement from a single source, Albin, who indicated that the plaintiff, Thompson, had engaged in criminal activity. The Supreme Court determined there was nothing in the record to indicate any awareness by the defendant of the probable falsity of the source's statement and that a failure to investigate alone does not itself establish bad faith. 390 U.S. at 732-33, 88 S.Ct. at 1326. At first blush, these facts appear somewhat similar to our own.[24] There is, however, a defining difference between *St. Amant* and this case. Here, none of the statements made to Clark at the after-meeting had any indicia of truthfulness because, according to his testimony, Clark had absolutely no reference to judge the

---

[24]In *St. Amant*, the facts were as follows:

St. Amant had no personal knowledge of Thompson's activities; he relied solely on Albin's affidavit although the record was silent as to Albin's reputation for veracity; he failed to verify the information with those in the union office who might have known the facts; he gave no consideration to whether or not the statements defamed Thompson and went ahead heedless of the consequences; and he mistakenly believed he had no responsibility for the broadcast because he was merely quoting Albin's words.

390 U.S. at 730, 88 S.Ct. at 1325.

veracity of any statement he received. On the other hand, in *St. Amant*, the defendant had substantial evidence upon which he could judge the veracity of his source:

> St. Amant made his broadcast in June 1962. He had known Albin since October 1961, when he first met with members of the dissident Teamsters faction. St. Amant testified that he had verified other aspects of Albin's information and that he had affidavits from others. Moreover Albin swore to the answers, first in writing and later in the presence of newsmen. According to Albin, he was prepared to substantiate his charges. St. Amant knew that Albin was engaged in an internal struggle in the union; Albin seemed to St. Amant to be placing himself in personal danger by publicly airing the details of the dispute.

390 U.S. at 733, 88 S.Ct. at 1326-27.

At best, Clark repeated in writing a false, scandalous rumor consisting of trumped up felony charges, convictions, and imprisonment in furtherance of removing Jenkins from office. At worst, Clark made up or imagined the felony charges, convictions, and imprisonment of Jenkins to further a predetermined result. In either instance, Jenkins has established Clark acted with "actual malice" by clear and convincing evidence.

## Conclusion

Clark's sole issue and the subparts thereto are overruled. Accordingly, we affirm the judgment of the trial court.

Patrick A. Pirtle
Justice

Quinn, C.J., concurring in result only. ___

40

# APPENDIX

DATE: Thursday, November 20, 2002
MEMORANDUM FOR: Ms. Daisy Evella Joe, CEO, B.C.J.L.O. Incorporated
                 The Honorable Pete Sessions, United States Representative
                 United States Department Of Justice – Civil Rights Division
REASON:    Murder and Intimidation of Black Citizens in Athens, Texas (Henderson County)
FROM:       Paul Martin Clark, President, B.C.J.L.O. Incorporated

The City of Athens, Texas (Pam Burton–Athens City Manager) extended an invitation to the Blacks in North Athens to discuss a pattern of murders and intimidation of Athens Black Residents by the Police Force of Athens. The Workshop as they labeled it was to be held at the Athens City Hall at 11:30 a.m. on 501 North Pinkerton Street (Annex Building). The Reverend Charles Stovall, Pastor of the Camp Wisdom United Methodist Church of Dallas, 12 Black Residents of Athens and myself were in attendance. The workshop never took place and was a mere future agenda item in their regular Athens City Hall Meeting Session. Only 3 people were allowed to speak. So, as you can see it lasted for only 9 minutes. One additional black resident attempted to speak and was abruptly cut off by Athens Mayor Jerry King who asked all of the black residents to leave the building because they had other city business to discuss. Mayor King also vented extreme hatred by telling the entire group of black Athens citizens that he did not appreciate them inviting, "OUTSIDERS" like Reverend Stovall and myself. He told us, the black group to speak with new Police Chief Jim Vance individually and not as a group. Here are some observations that need attention and immediate action by Congress and the Justice Department.

1. The memorandum of Agreement and Understanding between The Athens Police Department and the Black Citizens of Athens is null and void. It was signed by the former Police Chief of Athens Dave Harris who retired and still runs the Athens Police Department in an ex-officio capacity as a paid consultant. All memorandums of agreement and understanding are not recognized by law because they are not a law, rule or regulation.

2. The new police chief of Athens came from Garland, Texas Police Department which has a long standing legacy of hatred and abuse of black citizens. Athens Police Chief Jim Vance was at the helm of the Garland Police Department when a black pharmacist from the Eckerd's Drug Store in Garland was beaten beyond recognition by a Garland Police Officer in 1999. Athens in effect recruited a police chief with racist credentials to continue the legacy of unchecked murder of black citizens in Athens.

41

3.  No one from Congressman Pete Sessions Athens office or East Dallas Office showed up at the so-called workshop.   The citizens called Congressman Pete Sessions toll free number in Dallas and never received a call back.  There is a perception on the part of these citizens that the staff of Congressman Sessions Athens office has ties to the local Ku Klux Klan chapter in Athens and are large wealthy contributors to Congressman Pete Sessions election campaigns.

4.  The only black female Athens City Council member is Gladys Elaine Blanton Jenkins.  She is a convicted felon having served prison time in Texas and California for Prostitution and Drugs.  She is controlled by Athens Mayor Jerry King.  No one in the State of Texas can hold elective office who has felony convictions.  She must be removed from office immediately.

5.  A black man was killed by the Athens Police some three weeks ago. Nothing was investigated.

6.   Shaneque Tilley, a black female from Athens (DOB 7-22-1982) was arrested by the Athens Police as the (sic) crawled into the window of Tilley's North Athens home.  The Athens Police beat her as she was 9 months pregnant and killed her unborn child who was aborted.  Tilley is now chained naked to a prison bed in the Athens City Jail (Henderson County Seat), bleeding, has no access to medical care or sanitary napkins.  We asked Mayor Jerry King to give us access to Tilley–he denied it.  Tilley is also not allowed any bond from a black bail bondsman named Barbara and Clyde Bowman Sr. who can be reached at (903) 675-5474.  No hospital or doctor for a woman that had a miscarriage of a child at the brutal hands of the Athens City Police.

7.  The Athens Police intimidate, harass and murder black residents on a daily basis.  They come out of their police cars and approach black teens with their weapons drawn.  They follow black residents around the city, pulled over Ms. Barbara Bowman who had prom dresses. dumped the prom dresses into the grass and then stomped over them to make them unusable. They ticket black citizens even if they don't turn on a car turn indicator 100 feet from the stop sign to increase revenue and land all black into the jail system.  They intimidate black older citizens of Athens calling them nigger girl and nigger boy.  Ms. Bowman has a list of all the black citizens in Athens that have been murdered by the Athens police and the Klan who are one in the same.

8.  Peaceful picketing is not allowed in Athens and it is a law.  If blacks picket, they will be met head on by Athens Police.  The Police have taunted Ms. Bowman in Court during Trial in Judge Elaine Coffman's Court.

9.  Lee Alcorn, of the Coalition of Civil Rights took $6,700 from the black citizens of North Athens to represent them.  He turned around and sold their

confidential information to Mayor Jerry King and the outgoing Athens Police Chief. Now these citizens are targeted by the Police.

10. Councilwoman Elaine Jenkins threatened Mrs. Barbara Bowman because Mrs. Bowman called radio station KNON in Dallas and spoke about how the Athens Police were killing blacks and torturing them on a routine basis.

11. The Athens police does racial profiling. The only people punished in Athens Teen Court are blacks. The other white kids that get in trouble just merely pay a fine and never appear in court.

12. Mayor Jerry King refused to give the black citizens of Athens the minutes to the meeting. We demanded and he stated that 10 copies was basically too much. We would have to come back because the feeder on the Xerox machine was not working properly and would have to be manually fed. A woman whose son was murdered by the Athens Police is not allowed to visit her birthplace which is Athens, Texas. She can not visit her elderly mother. The last time she visited Athens, she was at the Dollar General Store, confronted by the Police and told to leave. Her elderly mother was visited by the Athens Police and threatened.

In closing, it was best summed up by Reverend Charles Stovall. "The Athens Police Force is responsible for the suffering and intimidation of Black citizens. The memorandum and it's (sic) revisions mean nothing to the City of Athens and the Police Force. Mrs. Bowman was not even listed on the Bonding List and the Police Chief issued her a letter of Apology. We do not know if Ms. Tilley is alive or dead.

Signed,

/s/

Paul Martin Clark
President
BCJLO Inc. (214) 328-3722