Aziz SHIHAB, Appellant,

v.

The EXPRESS–NEWS CORPORATION, Appellee.

No. 16221.

Court of Civil Appeals of Texas, San Antonio.

June 6, 1980.

Rehearing Denied Sept. 3, 1980.

Richard J. Karam, Terrence McDonald, San Antonio, for appellant.

G. Thomas Coghlan, Mark J. Cannan, Lang, Cross, Ladon, Boldrick & Green, San Antonio, for appellee.

## OPINION

CADENA, Chief Justice.

In this libel action plaintiff, Aziz Shihab, appeals from a judgment, based on jury findings, denying him recovery against defendants, The Express–News Corporation and Charles O. Kilpatrick. Kilpatrick holds the position of publisher of the corporation's two newspapers in San Antonio, one of which is the *San Antonio News.*

The controversy arose as a result of an article published in a magazine, *Texas Monthly,* in its November, 1976, issue, and a letter written by Kilpatrick to the magazine and to 31 persons whom he described as "opinion leaders" in response to the magazine article.

The magazine article was highly critical of the two newspapers published by the corporation. A portion of the article charged that "things are made to happen in order to create news" and quoted one reporter as saying that the *Express* and *News* "have both been using fabricated stuff ever since Murdoch took over." The magazine article continued:

> The work of now–departed staffer, Aziz Shihab, is most often cited in this connection. Shihab authored an expose alleging that Vietnamese refugees were operating a house of prostitution near Lackland Air Force Base. No one else was able to locate the house, and Shihab now describes the story as an exaggeration. He says the *News* sensationalized the story, wrote its own lead, and used his by–line over his protests. Shihab also was responsible for the story that a certain Saudi Arabian sheik wanted to buy the Alamo as a gift for his son. The story was carried worldwide, even drawing a declaration from Governor Dolph Briscoe that the famed landmark was not for sale. A search in Saudi Arabia, however, failed to turn up the sheik, and another search failed to turn up the son. Shihab, now a reporter in Dallas, says he found out about the whole thing from a Houston attorney who cannot be identified. *Express–News* publisher Kilpatrick has steadfastly refused comment.

The letter written by Kilpatrick contained the following:

> Mr. Smith [author of the magazine article] accused a former reporter for the *News,* Aziz Shihab, of fabricating two

stories and he inferred that I participated. Mr. Smith knew when he wrote that allegation that I had fired Mr. Shihab because I had lost confidence in him. This is clearly a distortion and Mr. Smith knew it when he made the charge.

The jury found that the "letter" written by Kilpatrick, "as it pertains to Mr. Shihab was libelous" (special issue no. 1); that the Kilpatrick letter was "substantially true" (special issue no. 2); and that at the time Kilpatrick wrote the letter "he knew that it was false or recklessly disregarded whether it was false or not" (special issue no. 4). In answer to issues 3, 5, 6 and 7 the jury found that the letter was the proximate cause of injury to plaintiff, assessed plaintiff's actual damages at $60,000.00; and awarded plaintiff punitive damages in the sum of $25,000.00 against the Express–News Corporation and $15,000.00 against Kilpatrick.

There is no evidence in the record suggesting that the two stories mentioned in the magazine article and referred to in the Kilpatrick letter were fabricated by plaintiff. The only evidence of fabrication concerns a third story which appeared in the News on August 1, 1975, with plaintiff's by–line and under the headline, "Gang rips off Lackland." This Lackland gang story was not connected with the story concerning the sale of the Alamo or with the story concerning the Vietnamese brothel.

 Plaintiff contends that proof of the fabrication of a story other than the two stories mentioned in the magazine article and the Kilpatrick letter cannot be relied on by defendants as a defense to the libel action.

> According to a respected commentator, [s]pecific charges cannot be justified by showing the plaintiff's general bad character; and if the accusation is one of particular misconduct, such as stealing a watch from A, it is not enough to show a different offense, even though it be a more serious one, such as stealing a clock from A, or six watches from B.

W. Prosser, Handbook of the Law of Torts § 116, at 798 (4th ed. 1971).

The American Law Institute, in Restatement (Second) of Torts § 581A, Comment f at 236–37 (1977), deals with the problem as follows:

> It is not enough that the accused person is found to have engaged in some other substantially different kind of misconduct even though it is equally or more reprehensible. Thus a charge of burglary against another is not justified by a finding that he has committed a murder. However, many charges are made in terms that are accepted by their recipient in a popular rather than a technical sense. Thus a charge of theft may be reasonably interpreted as charging any form of criminally punishable misappropriation, and in its truth may be established by proving the commission of any act of larceny or embezzlement.

It cannot be said that the Texas cases support Dean Prosser's view. In *Downer v. Amalgamated Meat Cutters & Butcher Workmen of North America*, 550 S.W.2d 744 (Tex.Civ.App.–Dallas 1977, writ ref'd n. r. e.), plaintiff, treasurer of a labor union, sought to recover because of a charge that he had misappropriated union funds. The charge was contained in a proof of loss filed by the union with plaintiff's bonding company. On the proof of loss form defendant listed a number of items charged to plaintiff as "advances" and charged that plaintiff had failed to account for all of the funds so advanced. These advances had been made on different dates, and the discrepancies itemized in the proof of loss totaled $2,187.77.

Summary judgment in favor of defendant was based on the finding that the accusation was true. On appeal plaintiff insisted that the defense of truth had not been established because the summary judgment proof related only to some of the items listed in the proof of loss and showed only that plaintiff had misappropriated $840.73. The court rejected this argument, pointing out that defendant was required to show only that the accusation was substantially true. The opinion states that the damage to plaintiff's reputation resulted from the

charge of misappropriation of union funds, and that proof of the substantial truth of that charge did not require that each and every item listed on the proof of loss be treated separately, imposing on defendant the burden of showing the accuracy of each item. The Court said: "We hold that regardless of the existence of a dispute concerning some of the items, the summary–judgment proof shows as a matter of law that the charge that plaintiff had misappropriated union funds was substantially true." 550 S.W.2d at 747.

In *Downer*, the charge that plaintiff had misappropriated $2,187.77 in union funds was treated simply as a charge that he had misappropriated union funds.

Other Texas cases reach results consistent with *Downer*.

In *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416 (Tex.Civ.App.–Forth Worth 1936, writ ref'd), the substantial truth of a charge that plaintiff had wasted $80,000.00 of the taxpayers' money on a useless project was considered sufficiently established although the evidence showed that only $17,-500.00 had been spent on the project. The Court reasoned that no more opprobrium attached to the waste of $80,000.00 that would be attached to the waste of $17,-500.00. 96 S.W.2d at 419.

Proof that plaintiff had been arrested for illegal possession of beer and wine is sufficient to establish the substantial truth of a statement that plaintiff had been arrested for illicit possession of tequila, whiskey, beer and wine. In reaching this conclusion the Court in *Lundberg v. Brownsville Herald Publishing Co.*, 66 S.W.2d 375 (Tex.Civ. App.–San Antonio 1933, no writ) reasoned that the "gist" of the accusation was that plaintiff had been arrested for illegal possession of intoxicants, and that the truth of that charge was established by proof of arrest for possession of wine and beer, since "it was just as much an offense to have the wine and beer as it would have been to have the tequila and whiskey." 66 S.W.2d at 376.

In *Caller Times Publishing Co. v. Chandler*, 122 S.W.2d 249, 252 (Tex.Civ.App.–San Antonio 1938), *aff'd*, 134 Tex. 1, 130 S.W.2d 853 (1939), this Court held that proof that plaintiff had been indicted for conspiracy to burglarize a bank established the substantial truth of a statement that plaintiff had been indicted for conspiracy to rob a bank, because the two offenses, robbery and burglary, were of equal grade and plaintiff had shown no injury resulting from the use of "rob" rather than "burglarize." The result, perhaps, can be explained on the basis of the theory, adopted by the Restatement, that, to the ordinary person, the words "burglary" and "robbery" are synonymous, but neither the court of civil appeals nor the supreme court adopted this rationale.

According to the reasoning in *Downer, Davis* and *Lundberg*, the gist or "sting" of the accusation that plaintiff fabricated the Vietnamese brothel and sale of the Alamo stories is the charge of fabrication. As plaintiff points out in his brief, if the credibility of a journalist is compromised he can be of no further use as a reporter. If this be true, the damage to a reporter's reputation stems from the charge of fabrication, and it can be concluded that there is no more opprobrium attached to the fabrication of one story than to the fabrication of another.

It can be argued that in *Downer, Davis* and *Lundberg* the misconduct proved was included in the accusation. For example, the charge in *Lundberg* that plaintiff had been arrested for possession of tequila, whiskey, wine and beer can be said to include the charge that plaintiff had been arrested for possession of wine and beer. But in none of these three cases was such an explanation offered or suggested in support of the conclusion reached. Further, such a theory cannot be advanced as an explanation for the holding in *Quaid v. Tipton* 21 Tex.Civ.App. 264, 51 S.W. 264 (1899, no writ).

In *Quaid* defendant had said, on various occasions, that plaintiff had stolen cotton from a bale of defendant's cotton which plaintiff had taken "in the direction of Collinsville." The evidence showed that the cotton which plaintiff had taken in the di-

rection of Collinsville did not belong to defendant, but defendant proved that on a different occasion plaintiff had taken a bale of defendant's cotton to Gainesville where he sold the cotton and kept the proceeds of the sale. Judgment in favor of defendant was affirmed. The opinion stated that the charge, in substance and effect, was that plaintiff had stolen cotton and that there was no "difference in the moral turpitude involved, whether the proof shows the theft of the . . . cotton in one or the other of the two transactions . . . ." 51 S.W. at 265. The contention that a charge of the theft of the cotton taken to Collinsville included an accusation of theft of the cotton taken to Gainesville on a different date can only be advanced if the charge is viewed as a general charge of theft.

The rule adopted by Dean Prosser can produce indefensible results. The two statements, "X is a murderer" and "X murdered A" produce the same result in the mind of the reader or listener. According to Prosser, proof that X murdered any person would establish proof of the charge, "X is a murderer." But in order to establish the truth of the statement that X murdered A, proof that X murdered B, or any person other than A, would not relieve the defendant of liability, nor would proof that X had murdered 100 persons benefit defendant if A was not included within the 100. The view of the Restatement is radically different, since it denies the availability of truth as a defense only where the misconduct is of a substantially different kind from the misconduct charged.

■ The critical test should be whether the defamation, as published, would affect the mind of the reader or listener in a different manner than would the misconduct proved. If the effect on the mind of the recipient would be the same, any variance between the misconduct charged and the misconduct proved should be disregarded. Under such a rule, proof that plaintiff had murdered B would justify the accusation that plaintiff had murdered A, at least in the absence of circumstances establishing a relation between plaintiff and A, which

would, in the mind of the average person, brand the murder of A by plaintiff more reprehensible than plaintiff's murder of B. Such a rule would not operate to decrease the protection which the law affords to a person's reputation.

In this case plaintiff does not argue, nor does the record establish, that the charge of fabrication of two identified stories produced in the minds of the readers of the Kilpatrick letter an effect more damaging to plaintiff's reputation than a simple charge of fabrication without specification or a charge that he fabricated the Lackland gang story. It cannot be said that the record establishes, as a matter of law, that the reference to two specific stories in the accusation "gave additional weight and volume to the opprobrium naturally arising from a simple charge of . . . ." fabrication, or that such reference to two specific stories "alters the complexion of the affair" or "produces a different effect on the mind, or amounts to a substantial aggravation of the main charge." 51 S.W. at 265. In the absence of a jury finding that the reference to two stories in the accusation amounts to a substantial aggravation of the main charge of fabrication, we cannot, in view of the record before us, hold that it did.

The story which appeared in the News on August 1, 1975, contained a lead paragraph which reported, "An armed gang of robbers has struck the Lackland [Air Force Base] rooms of foreign students the past two nights." We overrule plaintiff's contention that the evidence is legally and factually insufficient to support the conclusion that the Lackland gang story was fabricated. In summarizing the evidence, we shall discuss all of the evidence, including that which might be considered inconsistent with a finding of fabrication. Our conclusion, based on such a review of all of the evidence, that the evidence is sufficient to support the finding of fabrication necessarily includes the conclusion that, if only the evidence supporting such finding is considered, there is "some evidence" supporting that finding and that plaintiff's "no evidence" point is without merit.

According to plaintiff and his wife, on the morning of August 1, 1975, a man with a thick accent telephoned plaintiff's home after plaintiff had left for work and told plaintiff's wife that he had information concerning robberies at Lackland Air Force Base. Plaintiff's wife called plaintiff at the newspaper and told him about the call.

According to plaintiff, he immediately called several persons at Lackland. With one exception, these persons told plaintiff they had heard no reports of incidents concerning armed gangs. The one exception said he had heard about it but had no specific knowledge concerning the incidents. Plaintiff then called the Saudi Arabian liaison office at Lackland. The person who answered the telephone told plaintiff that the liaison officer with whom plaintiff wished to speak was not in the office at the time. According to plaintiff, this person, who identified himself as Mohammed Ali Ibrahim, told plaintiff about the armed gangs and the robberies the preceding two nights.

In his story, plaintiff identified his source as a Captain Mohammed Ali Ibrahim, whom he identified in the story as a Saudi Arabian liaison officer at Lackland. There is testimony that at the time there was only one Saudi Arabian liaison officer at Lackland and that the name of such officer was not Mohammed Ali Ibrahim. There is evidence sufficient to support the conclusion that no person named Mohammed Ali Ibrahim had ever been stationed at Lackland.

Plaintiff then called the public information officer at Lackland, Doug Moore, who said that he had no knowledge of any such incidents, but that he would investigate and call plaintiff. After checking with the security police and with other persons to whom reports of such incidents might have been made, Moore called plaintiff and again stated that there had been no reports of the two incidents which later were described by plaintiff in the lead paragraph of the story. Moore then gave plaintiff a list of all incidents involving foreign students which had been reported to Lackland authorities during the preceding few weeks, none of which involved invasions of students' rooms by an armed gang. Plaintiff's notes of a subsequent telephone conversation which he had with Moore reflect that, prior to the time that the story was written, Moore had denied the existence of armed gangs at Lackland.

After the lead paragraph of the story referring to the activities of an armed gang, the story referred to several of the incidents which Moore had described to plaintiff and, in some instances, the story referred to specific buildings at Lackland. The story did not refer to Moore's denial, and a person reading the story could reasonably interpret the entire story, particularly the references to the incidents which Moore had described, as involving a confirmation by Lackland authorities of the presence of an armed gang at Lackland which was preying on foreign students attending the language school.

As the result of a strong letter of protest from the commanding general of Lackland Air Force Base, Kilpatrick held a conference with plaintiff. The letter particularly protested the failure to include Moore's denial in the story and the use of the incidents which Moore had related to plaintiff in a manner suggesting that the "Lackland spokesman" referred to in the story had confirmed the existence of an armed gang.

Kilpatrick directed plaintiff to arrange a meeting between plaintiff's claimed source, Mohammed Ali Ibraham, and Kilpatrick so that Kilpatrick could question the man whom plaintiff identified as the source of the story. During the conversation Kilpatrick rejected plaintiff's contention that the conversation be by telephone. Plaintiff admitted that he made no effort to arrange a meeting between Kilpatrick and Mohammed Ali Ibraham because, in his opinion, there was no reason for holding such a meeting.

The uncontradicted testimony is that foreign students at Lackland are not assigned individual rooms but are quartered in "open bay" barracks. There is also uncontradicted testimony that some of the buildings specifically identified in plaintiff's story did not exist.

The only evidence concerning the proof of the "armed gang" story is the testimony of plaintiff concerning what others told him.

The remainder of plaintiff's points of error concern the failure of the trial court to submit special issues and an explanatory instruction requested by plaintiff. Although plaintiff made objections to the charge as submitted to the jury, all of which objections were overruled, plaintiff does not here complain of such rulings.

Plaintiff's first requested special issue inquired whether the Kilpatrick letter conveyed to the mind of the reader that (a) the writer of the magazine article had accused plaintiff of fabricating two stories; or (b) Kilpatrick had fired plaintiff "for loss of confidence"; or (c) plaintiff was fired as the result of the fabrication of the two stories; or (d) the loss of confidence was a result of plaintiff's fabrication of the two stories. The form of the requested issue permitted a separate answer to each of the four distinct inquiries. The accompanying instruction informed the jury: "You are instructed that in answering the foregoing questions the test to be applied is what effect the publication had on the mind of the ordinary reader; it is not so much the idea which the writer intended to convey but that, in fact, he did convey."

There was no reason to inquire whether the letter conveyed to the mind of the average reader that the author of the magazine article had accused plaintiff of fabricating two stories or that Kilpatrick fired plaintiff "for loss of confidence." The letter unequivocally makes those statements and cannot be reasonably interpreted otherwise. Inquiries (a) and (b) concerned matters as to which there could be no factual issue to be resolved by the jury.

It is clear that the purpose of the requested issue was to obtain a finding as to the libelous nature of the letter. Special issue 1, as submitted to the jury, inquired whether the letter was libelous as to plaintiff and this issue was accompanied by a similar instruction appended to plaintiff's requested issue. The issue submitted was answered favorably to plaintiff. It cannot be said that plaintiff was harmed by the failure to submit the issue which he requested relating to the libelous nature of the letter.

The issue submitted to the jury (special issue 2) for the purpose of determining the question of truth simply inquired whether "the letter in question . . . was substantially true." In connection with this inquiry the court instructed the jury that substantial truth "does not require that the letter in question be literally true in every detail."

Plaintiff's requested special issue no. 2 contained separate parts inquiring whether the jury found that each statement "inquired about" in special issue no. 1 was true. The form of the issue permitted the jury to give separate answers concerning the truth of each statement. This requested issue was accompanied by an instruction explaining that the truth of the statement must extend "to every reasonable implication an [sic] inference which may be drawn from such statement," but that "it is not required that the statements and matters complained of be literally true; it is sufficient that they be substantially true."

As requested, this issue asked the jury (a) whether the statement that the writer of the magazine article had accused plaintiff of fabricating two stories was true; (b) whether the statement that Kilpatrick had fired plaintiff "for loss of confidence" was true; (c) whether the statement that plaintiff was fired because of the fabrication of the two stories mentioned in the article was true; and (d) whether the statement that the loss of confidence was a result of the fabrication by plaintiff of the two stories mentioned was true.

■ The form of plaintiff's second requested special issue was unconditional. It was in no way conditioned upon affirmative findings that the letter conveyed to the mind of the reader the statements designated in the first requested issue as statements (a), (b), (c) and (d). That is, the second requested issue assumed, for example, that the letter conveyed to the mind of the reader that plaintiff was fired because he fabri-

cated the two stories and that the fabrication of such stories caused Kilpatrick to lose confidence in plaintiff. We agree with plaintiff that the letter can be interpreted as conveying the idea that plaintiff was fired as a result of his fabrication of the two mentioned stories. But this is only one of the reasonable interpretations to which the letter, taken as a whole, is subject. The form of the requested issue assumed that the letter, taken as a whole, conveyed the idea that plaintiff was fired because he fabricated the two stories. The requested issue constituted a comment on the weight of the evidence and the court properly refused to submit it. The requested issue would have been vulnerable to an objection that it constituted such a comment. We cannot brand as error the refusal of the court to submit an issue which was subject to this defect.

Plaintiff's last point complains of the trial court's failure to submit his special instruction in connection with special issue no. 2. The requested instruction differed from that given in that it would have told the jury that proof of the truth of a statement "must extend to every reasonable implication and inference which may be drawn from such statement."

Plaintiff relies on *Express Publishing Co. v. Gonzalez*, 350 S.W.2d 589, 592 (Tex.Civ. App.–Eastland 1961, writ ref'd n. r. e.), where the Court said:

> Although the truth of an alleged libel may be proven as a complete defense it is not a defense to show that a statement in a publication, if taken alone, is literally true, when other facts are omitted which plainly refute the false impression of the partial statement. A statement is not true or even substantially true if, by implication, an entirely untrue impression is made by omission of part of the facts.

There can be no quarrel with the *Gonzalez* statement on which plaintiff relies, but the Court was not dealing with rules relating to the giving of explanatory instructions. Under Rule 277, Tex.R.Civ.P. (1977), a court is not required to give to the jury a general explanation of the law.

With reference to the submission of explanatory instructions, the only requirement is that the trial court must give definitions of legal and other technical terms. *Union Oil Co. of California v. Richard*, 536 S.W.2d 955, 958 (Tex.Civ.App.–Beaumont 1976, no writ).

The trial court's instruction concerning substantial truth was correct. *Downer v. Amalgamated Meat Cutters and Butcher Workmen of North America*, 550 S.W.2d 744, 746 (Tex.Civ.App.–Dallas 1977, writ ref'd n. r. e.); *Enterprise Co. v. Wheat*, 290 S.W. 212, 225 (Tex.Civ.App.–Beaumont 1927, writ dism'd).

The judgment of the trial court is affirmed.