

NUMBER 13-18-00620-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

PENSION ADVISORY GROUP, INC.
AND PAUL D. HINSON,                                                      Appellants,

v.

FIDELITY SECURITY LIFE INSURANCE
COMPANY AND DAVID SMITH,                                              Appellees.

On appeal from the 343rd District Court
of Aransas County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa**
**Memorandum Opinion by Chief Justice Contreras**

Appellants/cross-appellees Pension Advisory Group, Inc. and Paul D. Hinson (collectively Hinson) filed suit against appellees/cross-appellants Fidelity Security Life Insurance Company and David Smith (collectively FSL). Hinson alleged that FSL

employees conspired to defame him by accusing him of forging his client's signature on a commission disclosure form. FSL filed a counterclaim for money had and received. The trial court granted summary judgment dismissing Hinson's claims and FSL's counterclaim, and both sides appealed. We affirm.

## I. BACKGROUND

This is the second appeal of a summary judgment arising out of this case. We previously described the background of the case as follows:

> After consulting Frank Renfro, the trustee of a defined benefit pension plan for Star Consultants, Inc., Hinson, the plan's general agent, suggested that the plan be converted to an annuity as a "412(e)(3) plan." Hinson then contacted George Evanson from CJA & Associates, Inc. ("CJA") to find the best annuity plan. Renfro purchased an annuity from [FSL], and Hinson and CJA received commissions for the sale.
>
> Subsequently, Renfro requested that his attorney, Deborah Welch, evaluate his personal estate plan, which included the [FSL] annuity. According to [FSL], at some point after becoming aware of this evaluation, Hinson requested that Renfro sign a commission disclosure notice concerning the annuity. [FSL] asserts that "Hinson claimed that he had a copy of the notice with Renfro's signature"; however, Renfro and Welch denied that the signature was authentic. Renfro requested a refund of his money because he claimed he was not aware that a commission had been paid to Hinson.
>
> Subsequently, [FSL] representatives decided to refund the money to Renfro, and according to Hinson, they did not call him or CJA to discuss Renfro's complaint. Pursuant to its contract, [FSL] terminated the annuity and exercised its right to recover commissions from CJA and Hinson in the amount of $337,000. According to Hinson, [FSL]'s employee, David Smith, then informed CJA's employee, Ray Ankner, that [FSL] had cancelled Renfro's annuity due to a complaint made by Renfro concerning the commission disclosure notice and that [FSL] was seeking reimbursement of the commission. Hinson further claims that [FSL]'s general counsel [Martha Madden] e-mailed CJA's general counsel informing him that [FSL] was cancelling Renfro's annuity plan "because Hinson did not disclose the commissions [to Renfro] and did not get proper documentation for the Plan." Hinson states, "Later, [Madden] specifically accused Hinson of forging the [commission] Disclosure Notice." According to Hinson, [] CJA requested an investigation and strongly disagreed that Hinson had forged Renfro's signature.

> Hinson sued [FSL], among others, for business disparagement, defamation under both libel and slander, tortious interference with contracts, conspiracy, breach of fiduciary duty, fraud, breach of contract, and tortious interference with prospective contracts. [FSL] filed motions for no-evidence and traditional summary judgment. The trial court granted both motions. The trial court also granted [FSL]'s motion to strike Hinson's summary judgment evidence, which included the depositions of James Ferguson and Stuart J. Wright.

*Pension Advisory Grp., Inc. v. Fid. Sec. Life Ins. Co.*, No. 13-14-00566-CV, 2016 WL 5845920, at *1 (Tex. App.—Corpus Christi–Edinburg Sept. 30, 2016, pet. denied) (mem. op.).[1]

In the earlier appeal, we first held that the trial court did not err by excluding the deposition testimony of Ferguson and Wright on grounds that it "was conclusory, speculative, not based on specialized knowledge or a reliable foundation, and not based on any methodology." *Id.* at *2–3. In light of this conclusion, we further held that no-evidence summary judgment was proper on Hinson's business disparagement and tortious interference claims. *Id.* at *4–7 (concluding that "Hinson failed to provide more than a scintilla of probative evidence to raise a genuine issue of material fact regarding malice" and that, in his response to FSL's summary judgment motion, "Hinson did not address [FSL]'s claim that there is no evidence that it intended to interfere with Hinson's prospective business relationships"). Moreover, Hinson failed to adequately brief his argument as to his fiduciary duty claim. *Id.* at *9. However, we held that FSL failed to meet its burden to show its entitlement to traditional summary judgment on Hinson's defamation claim. *Id.* at *7–8. In particular, though FSL argued in its motion that Hinson could not

---

[1] We take judicial notice of the record in the 2016 appeal. *See* TEX. R. EVID. 201; *Estate of York*, 934 S.W.2d 848, 851 (Tex. App.—Corpus Christi–Edinburg 1996, writ denied) (holding that an appellate court may take judicial notice of its own records in a case involving the same subject matter between the same parties).

3

prove defamation damages because the alleged false statements "were not published outside of CJA," it failed to cite any evidence controverting the allegation, made in Hinson's live pleading, that FSL published the statements to Welch and to Renfro's accountant Louis Meers. *Id.* at *8. Finally, summary judgment was also improper on Hinson's conspiracy claim because: (1) despite arguing that Smith could not have conspired with it because he was its employee, FSL did not produce any evidence showing that Smith was acting in his corporate capacity; and (2) despite arguing that Hinson could not show the underlying tort of fraud, FSL did not produce any evidence conclusively negating reliance or any other element of fraud. *Id.* at *9.

The record reflects that FSL filed a counterpetition for money had and received in 2013. After summary judgment was rendered on Hinson's claims in 2014, FSL non-suited its counterclaim without prejudice. On remand, FSL repleaded its counterclaim, and each side moved for summary judgment in 2018 seeking dismissal of the other side's claims.

As to Hinson's defamation claim, FSL argued in its 2018 summary judgment motion that: (1) the alleged defamatory statements were true or substantially true; (2) the claims are barred by qualified privilege; (3) the statements were not published with negligence; and (4) Hinson has no evidence of actual damages. As to Hinson's conspiracy claim, FSL argued: (1) a principal cannot conspire with an agent; (2) there was no "object to be accomplished" or "unlawful, overt act"; (3) there is no evidence of a "meeting of the minds"; (4) Hinson cannot establish proximate causation; and (5) there was no underlying tort. FSL attached various pieces of evidence to its motion, including fourteen deposition transcript excerpts. Hinson filed a response to the motion along with over forty exhibits, including twenty-nine deposition transcript excerpts. FSL filed a reply.

In his own 2018 summary judgment motion, Hinson contended that FSL's money had and received claim should be dismissed because equitable relief is inappropriate where there is a "valid, express contract" covering the subject matter of the parties' dispute. Hinson attached various pieces of evidence to his motion; FSL filed a response including more evidence; and Hinson filed a reply.

The trial court granted both 2018 summary judgment motions and dismissed all pending claims. Both Hinson and FSL filed notices of appeal.

## II. DISCUSSION

On appeal, Hinson presents the following issues: (1) no-evidence summary judgment was improper on the issues of substantial truth and qualified privilege because those are affirmative defenses; (2) as a private defendant in a suit not involving a public concern, FSL had the burden to establish substantial truth; (3) FSL cannot prove the substantial truth of the allegedly defamatory statements by pointing to conduct different than that discussed in the statements; (4) the law of the case doctrine requires us to reject FSL's assertions regarding qualified privilege, the lack of damages, and the lack of a combination of conspirators; (5) FSL failed to conclusively negate actual malice, which if proven would defeat qualified privilege; (6) FSL failed to conclusively prove "publication to another party having a corresponding interest"; (7) FSL failed to conclusively prove that qualified privilege applied to "all their defamatory publications"; (8) FSL failed to conclusively negate defamation damages; and (9) FSL failed to conclusively negate the existence of a conspiracy.[2]

---

[2] The discussions in the argument section of Hinson's brief do not correspond to the unenumerated list of issues presented. We will address all issues fairly raised, adequately briefed, and necessary to the disposition of the appeal. *See* TEX. R. APP. P. 47.1; *see also Horton v. Stovall*, No. 18-0925, 2019 WL 6971668, at *3 (Tex. Dec. 20, 2019) (noting that appellate courts should "reach the merits of an appeal

FSL's combined appellee's and cross-appellant's brief focuses on responding to the issues raised by Hinson. It also argues that summary judgment on its money had and received claim was improper because there was no "valid, express contract" to which both Hinson and FSL were signatories.

## A.      Standard of Review

A movant for traditional summary judgment has the burden to establish that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). To do this, a defendant must conclusively negate at least one essential element of the plaintiff's claim. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017). A no-evidence summary judgment motion requires the non-movant to present evidence raising a genuine issue of material fact supporting each element contested in the motion. TEX. R. CIV. P. 166a(i); *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). Here, both traditional and no-evidence grounds were raised and both parties presented evidence; therefore, the "differing burdens are immaterial and the ultimate issue is whether a fact issue exists." *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019).

We review summary judgments de novo. *Id.* In doing so, we view the evidence in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. *Buck v. Palmer*, 381 S.W.3d 525, 527 (Tex. 2012) (per curiam); *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

---

whenever reasonably possible" and that "disposing of appeals for harmless procedural defects is disfavored." (citing *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008)).

**B.    Defamation**

The elements of defamation are: (1) the publication of a statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding). The status of the person allegedly defamed determines the requisite degree of fault. *Id.* A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *Id.* The plaintiff must plead and prove damages unless the statements at issue are defamatory per se. *Id.* Defamation per se refers to statements that are so obviously harmful that general damages may be presumed. *Id.*

Hinson's third issue contends that the summary judgment evidence did not conclusively establish substantial truth. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990) (stating that a defendant may defeat a defamation action at the summary judgment stage by showing the alleged defamatory publication was substantially true); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 73.005 ("The truth of the statement in the publication on which an action for libel is based is a defense to the action.").[3] This requires consideration of whether, in the mind of an average reader or listener, the alleged

---

[3] The parties dispute whether substantial truth is an affirmative defense which FSL bore the burden to prove, or whether falsity is an essential element of defamation which Hinson bore the burden to prove. *Compare Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ("In suits brought by private individuals, truth is an affirmative defense to slander.") *and Town of S. Padre Island v. Jacobs*, 736 S.W.2d 134, 140 (Tex. App.—Corpus Christi–Edinburg 1986, writ denied) ("For years the courts of Texas have recognized that in libel and slander actions, truth of the defamatory statements is an affirmative defense, the burden of proving truth being placed on the defendant.") *with Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) ("The elements of a prima facie case for defamation are: (1) the defendant published a false statement . . . .") *and Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017) ("The elements of a defamation claim include (1) the publication of a false statement of fact to a third party . . . ."). We need not decide the issue here. *See* TEX. R. APP. P. 47.1; *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019) (observing that, when both traditional and no-evidence summary judgment grounds are raised and both parties present evidence, the "differing burdens are immaterial and the ultimate issue is whether a fact issue exists").

defamatory publication is more damaging to the plaintiff's reputation than a true statement would have been. *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013); *McIlvain*, 794 S.W.2d at 16. To determine a publication's meaning, we look to its "gist." *McIlvain*, 794 S.W.2d at 16.

In his live petition, Hinson contended that FSL employees Smith and Madden defamed him by publicly accusing him of forging Renfro's signature on the commission disclosure form. Hinson's petition specifically alleged that, in a June 29, 2012 email to CJA's general counsel, Jeff Bleiweis, Madden "specifically accused Hinson of forging" Renfro's signature on the form.[4] Hinson further alleged that FSL "specifically told numerous unrelated parties," including Welch and Meers, that Hinson forged Renfro's signature. The petition stated: "Pleading alternatively; FSL . . . implied that Hinson forged Renfro's signature or that was at least the gist of Defendants' statements." Hinson alleged in his petition that, in fact, the disclosure form "included Renfro's signature, or a signature

---

[4] The email, which was attached as evidence to FSL's motion, stated in its entirety:

Dear Jeff:

I understand that you are currently on vacation. This e-mail is a follow-up to my voice mail of today.

FSL has been requested to return all monies on the Star Group Consultants (Frank Renfro) with accumulated interest. There is an additional request that all loads be waived.

This request has been made based upon the following: 1) the failure to disclose commissions; and the 2) failure to obtain appropriate documentation regarding the transaction. From FSL's standpoint, such failures would arise under CJA's requirement to supervise the soliciting agent.

Under the Marketing Services, if contributions are refunded within 5 years of the first premium deposit because the Annuity is cancelled or is Void with no legal effect, then FSL will chargeback all commissions.

Due to the cancellation or voiding of Star Group Consultants' Annuity, FSL will be charging back commissions.

I am happy to discuss this situation with you upon your return from vacation.

Martha

by Pam Nicholson authorized by Renfro, and was not a forgery. . . ."

In contending that the statements at issue were substantially true, FSL claimed in its 2018 summary judgment motion that Hinson "admitted a significant amount of improper and questionable conduct surrounding the transaction with Renfro." In particular, FSL pointed to deposition testimony indicating that: (1) Hinson did not disclose to Renfro that he would receive a commission; (2) Hinson sent a blank form to Renfro "with an expectation that Renfro would sign it" despite CJA's policy requiring the form to be pre-completed; (3) after the form was returned to Hinson with what appeared to be Renfro's signature, Hinson altered it to show that his commission would be five percent, and he then forwarded it to CJA; and (4) when Welch asked Hinson for a copy of the signed commission disclosure form, Hinson told her he "had a signed copy in [his] files," but contemporaneously (and without Welch's knowledge) asked Renfro to sign a new version of the form.

The summary judgment evidence also included deposition testimony by Ankner stating that Smith told him that "Hinson forged the documents, and that's part of the reason why he was sending the money back." When asked at his deposition whether "anyone associated with FSL ever indicat[ed] that Mr. Hinson may have forged Renfro's signature," Smith replied: "There was some discussion about that, yes." But in an affidavit, Smith denied that he ever spoke to Ankner "about the signature issue." In his deposition, Hinson agreed that his assistant sent a blank disclosure notice to Renfro and asked for Renfro's signature. When asked whether he expected Renfro to sign the disclosure form even though it did not have the commission percentage listed, Hinson replied: "If he wanted to know the commission, he would have called me on the telephone and would

9

quiz me as to the commission. So therefore, yes." Hinson appeared to deny that it was important for his clients to know the amount of the commission he was receiving.[5]

Hinson argues that this evidence cannot establish substantial truth of the alleged defamatory statements because it describes conduct different than what was described in those statements. Hinson quotes the following part of a comment to § 581A of the Restatement (Second) of Torts, concerning the substantial truth defense to defamation:

---

[5] The following colloquy occurred at Hinson's deposition:

| | |
|---|---|
| Q. [Renfro's counsel] | [T]he commission that one charges—the fee that one charges, whether it be a lawyer, CPA or tax planner like yourself, I mean, that's one of the more important elements of the relationship, right? Clients need to know what you're charging them. Do you agree with that? |
| A. [Hinson] | No, sir, I don't think it has any bearing. If you accomplish the job that is set out, it is irrelevant and immaterial to what the fee is paid as long as it is accomplishing the client's goals. |
| Q. | So I hear you saying it's okay to keep your fee a secret from the client as long as you're doing a good job; is that right? |
| A. | If I'm charging them a fee, I'm disclosing it. |
| Q. | That was my question earlier. Maybe you didn't understand it. |
| | What I was saying is you recognize, like I do—Mr. Renfro knows what I'm charging him. All my clients know what I charge them. . . . Would you acknowledge to the ladies and gentlemen of the jury that one of the things that you need to do and are required to do is to let your clients know what you're going to charge them? |
| A. | I have a published fee schedule, as I've outlined to earlier, that states what my fees are. The commissions that I receive from various insurance carriers run from nothing to 140 percent on some life insurance contracts. |
| Q. | So the answer is yes, I do acknowledge that it's important for all my clients to know what I'm going to charge them for my services? |
| A. | Either you have a hearing impairment or you did not understand my answer. The answer is quantitatively [sic] no. . . . I do not feel that I need to disclose commissions to my clients in life insurance transactions. I never have. I never will. It is not a requirement by law. |
| | Only until 2011 was it a requirement from the Internal Revenue Service that I disclose what my agent's commission would be off a qualified plan. |
| | I subsequently since that time have disclosed everything to my clients. |

10

"It is not enough that the accused person is found to have engaged in some other substantially different kind of misconduct even though it is equally or more reprehensible. Thus a charge of burglary against another is not justified by the finding that he has committed a murder." RESTATEMENT (SECOND) OF TORTS § 581A cmt. f (AM. LAW INST. 1977). Hinson claims that, to the extent the evidence shows "improper and questionable conduct surrounding the transaction with Renfro," it is not the same conduct which he was accused of in the alleged defamatory statements—i.e., forging Renfro's signature on the commission disclosure notice.

On the other hand, FSL points to *Shihab v. Express-News Corp.*, 604 S.W.2d 204, 206 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.), which rejected a similar argument. There, a journalist claimed that a newspaper publisher defamed him by stating in a letter that he "had lost confidence in him" after the journalist was accused in a magazine article of fabricating two news stories. *Id.* at 205–06. Trial evidence did not suggest that the journalist fabricated the two stories mentioned in the magazine article, but there was evidence that he fabricated a third, unrelated news story. *Id.* at 206. Nevertheless, the San Antonio court of appeals affirmed the trial court's take-nothing judgment based on the substantial truth defense. *Id.* at 206–08. In doing so, the court surveyed Texas cases and found that they do not support the notion, espoused by Dean Prosser, that "if the accusation is one of particular misconduct, such as stealing a watch from A, it is not enough to show a different offense, even though it be a more serious one, such as stealing a clock from A, or six watches from B." *Id.* at 206 (citing *Downer v. Amalgamated Meatcutters & Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. App.—Dallas 1977, writ ref'd n.r.e.) (affirming finding of substantial truth where alleged defamatory

11

statement accused plaintiff of misappropriating $2,187.77 in union funds, but evidence showed that plaintiff misappropriated only $840.73 of union funds); *Caller Times Publ'g Co. v. Chandler*, 122 S.W.2d 249, 252 (Tex. App.—San Antonio 1938) (same where newspaper reported that plaintiff was charged with conspiracy to rob a bank, but evidence showed that plaintiff was charged with conspiracy to commit burglary), *aff'd*, 130 S.W.2d 853 (Tex. 1939); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419 (Tex. App.—Fort Worth 1936, no writ) (same where plaintiff was accused of wasting $80,000 in taxpayer money, but evidence showed that plaintiff wasted only $17,575.94 in taxpayer money); *Lundberg v. Brownsville Herald Publ'g Co.*, 66 S.W.2d 375, 376 (Tex. App.—San Antonio 1933, no writ) (same where newspaper reported that plaintiff was arrested for illegal possession of tequila, whiskey, beer, and wine, but evidence showed that plaintiff was arrested for illegal possession of beer and wine only); *Quaid v. Tipton*, 51 S.W. 264, 265 (Tex. App.—Fort Worth 1899, no writ) (same where plaintiff was accused of stealing a particular amount of cotton from a particular bale, but evidence showed plaintiff stole a different amount of cotton from a different bale); WILLIAM M. PROSSER, HANDBOOK OF THE LAW OF TORTS § 116 (4th ed. 1971)). Instead,

> [t]he critical test should be whether the defamation, as published, would affect the mind of the reader or listener in a different manner than would the misconduct proved. If the effect on the mind of the recipient would be the same, any variance between the misconduct charged and the misconduct proved should be disregarded. Under such a rule, proof that plaintiff had murdered B would justify the accusation that plaintiff had murdered A, at least in the absence of circumstances establishing a relation between plaintiff and A, which would, in the mind of the average person, brand the murder of A by plaintiff more reprehensible than plaintiff's murder of B. Such a rule would not operate to decrease the protection which the law affords to a person's reputation.

*Id.* at 208. Thus, substantial truth may be shown when the actual misconduct proven is of the same general type as the misconduct alleged, though less grave or of a smaller

magnitude.[6] *See Dolcefino v. Turner*, 987 S.W.2d 100, 115 (Tex. App.—Houston [14th Dist.] 1998) ("Insurance fraud of $1.7 million is no less defamatory than $6.5 million."), *aff'd sub nom. Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000).

We agree with FSL that the instant case is analogous. Hinson's own testimony establishes that he sent a blank commission disclosure notice to Renfro and asked him to sign it; then, after receiving the form with Renfro's apparent signature, Hinson altered it to show the commission percentage before forwarding it on to CJA. Thus, even assuming that FSL employees accused Hinson of the specific criminal offense of forgery, the evidence supported a finding that this accusation was substantially true. *See* TEX. PENAL CODE ANN. § 32.21(a)(1)(A) (defining "forge" as "to alter, make, complete, execute, or authenticate any writing so that it purports: (i) to be the act of another who did not

---

[6] This is illustrated by language in the aforementioned Restatement comment which appears directly after the portion quoted by Hinson:

> However, many charges are made in terms that are accepted by their recipient in a popular rather than a technical sense. Thus a charge of theft may be reasonably interpreted as charging any form of criminally punishable misappropriation, and in its truth may be established by proving the commission of any act of larceny or embezzlement.

RESTATEMENT (SECOND) OF TORTS § 581A cmt. f (AM. LAW INST. 1977). It is also illustrated by the cases cited in *Shihab. See Downer v. Amalgamated Meatcutters & Butcher Workmen of N. Am.*, 550 S.W.2d 744, 747 (Tex. App.—Dallas 1977, writ ref'd n.r.e.) ("In the present case, the damage to plaintiff's reputation is alleged to have resulted from the charge that plaintiff had misappropriated union funds. We do not think that each and every item listed on the proof of loss must be treated as a separate charge, requiring defendants to show the complete accuracy of each item in order to establish the defense of truth."); *Caller Times Publ'g Co. v. Chandler*, 122 S.W.2d 249, 252 (Tex. App.—San Antonio 1938) ("The offenses [conspiracy to commit robbery and conspiracy to commit burglary] are of equal grade, and no injury is shown by the published inaccuracy."), *aff'd*, 130 S.W.2d 853 (Tex. 1939); *Fort Worth Press Co. v. Davis*, 96 S.W.2d 416, 419 (Tex. App.—Fort Worth 1936, no writ) ("There is no more opprobrium attached to or charged by saying that $80,000 of the taxpayers' money was wasted in this project than there would be should the charge have been made that $17,500 of the taxpayers' money was wasted."); *Lundberg v. Brownsville Herald Publ'g Co.*, 66 S.W.2d 375, 376 (Tex. App.—San Antonio 1933, no writ) ("[T]he fact that it was not shown, as stated in the publication, that tequila and whisky were found in the hotel, would not cause the publication to be false and untrue, as it was just as much an offense to have the wine and beer as it would have been to have the tequila and whisky."); *Quaid v. Tipton*, 51 S.W. 264, 265 (Tex. App.— Fort Worth 1899, no writ) ("The charge, in substance and in effect, here shown, was that appellant had stolen rent cotton; and we are unable to appreciate any difference in the moral turpitude involved, whether the proof shows the theft of the rent cotton in one or the other of the two transactions indicated . . . .").

authorize that act; [or] (ii) to have been executed at a time or place or in a numbered sequence other than was in fact the case . . . ”); *see also id.* § 32.21(e-1) (stating that, if a person forges a writing to obtain property valued between $150,000 and $300,000, the offense is second-degree felony, regardless of how the writing is forged).[7] The damage to Hinson's reputation, for which he now seeks redress, stemmed from the suggestion that he falsified a document to make it appear that Renfro had acknowledged and consented to the commission that Hinson would receive, when in fact he knew that Renfro had not done so. Whether Hinson did this by falsely signing Renfro's name on the form, or by adding the relevant information to the form after it was already purportedly signed, makes little difference to the level of opprobrium attached to the accusation. In any event, to the extent the evidence showed that FSL employees actually accused Hinson of the crime of forgery, they did not specifically state that Hinson *falsely signed Renfro's name on the form* (as opposed to falsely adding information to an already-signed form), and there is nothing in the circumstances surrounding the alleged defamatory statements which indicates that this was the intended or accepted meaning.

We conclude that, in the mind of an average reader or listener, the alleged defamatory statements are no more damaging to Hinson's reputation than a true statement would have been. *See Neely*, 418 S.W.3d at 53–64; *McIlvain*, 794 S.W.2d at 16. Accordingly, summary judgment was proper on grounds of substantial truth.[8] We overrule Hinson's third issue.

---

[7] This is consistent with the common, dictionary definition of forgery. *See* MERRIAM-WEBSTER'S ONLINE DICTIONARY, at https://www.merriam-webster.com/dictionary/forgery (last visited Feb. 6, 2020) (defining "forgery" as "the crime of falsely and fraudulently making or altering a document").

[8] In light of this conclusion, we need not address Hinson's arguments regarding qualified privilege, negligence, or actual damages. *See* TEX. R. APP. P. 47.1.

## C. Conspiracy

Civil conspiracy requires (1) two or more persons who agree upon an object, (2) a meeting of minds on the object to be accomplished, and (3) one or more overt, unlawful acts committed in furtherance of the conspiracy, (4) which results in damages. *Hicks v. Grp. & Pension Adm'rs, Inc.*, 473 S.W.3d 518, 532 (Tex. App.—Corpus Christi–Edinburg 2015, no pet.).

In its 2018 summary judgment motion, FSL argued that it was entitled to judgment as a matter of law on Hinson's conspiracy claim because, among other reasons, "Hinson cannot satisfy the underlying-tort element of a conspiracy claim." *See, e.g., Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."). In addressing this potential summary judgment ground in its response in the trial court and on appeal, Hinson relies entirely on his earlier arguments concerning his defamation claim. He asserts that, because "summary[ ]judgment fails as to defamation, summary[ ]judgment as to an underlying tort for conspiracy likewise fails." Therefore, given our conclusion that summary judgment was proper on FSL's substantial truth defense to defamation, we must conclude that summary judgment was also proper on Hinson's conspiracy claim.[9]

We overrule Hinson's fourth and ninth issues.[10]

---

[9] To the extent Hinson relies on an underlying tort other than defamation to support his conspiracy claim, that argument has been neither preserved nor adequately briefed. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); TEX. R. APP. P. 38.1(i).

[10] In light of this conclusion, we need not address Hinson's remaining issues. *See* TEX. R. APP. P. 47.1.

15

**D.      Counterclaim**

Money had and received is an equitable claim intended to prevent unjust enrichment. *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 710–11 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied). To prove it, a plaintiff must show that the defendant holds money which in equity and good conscience belongs to the plaintiff. *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808, 814 (Tex. App.—Dallas 2012, no pet.); *Doss*, 210 S.W.3d at 711. But "[w]hen a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Thus, when a valid, express contract covers the subject matter of the parties' dispute, there can generally be no recovery under a quasi-contract theory such as money had and received. *See id.*

> FSL's counterclaim for money had and received alleged in its entirety as follows:
>
> [FSL] had a Marketing Services Agreement with [CJA]. Per the terms of the Agreement, when contributions are refunded within the first 5 years of the first premium deposit, then the Insurer will chargeback all commission. [FSL] refunded the contribution to [Renfro]. Accordingly, [FSL] is entitled to a return of the commission ultimately paid to [Hinson]. [Hinson] hold[s] money that belongs to [FSL] in equity and good conscience.

Hinson argued in his 2018 summary judgment motion that it is entitled to judgment as a matter of law on the counterclaim "because the express contracts between FSL, CJA and Hinson govern the payment and/or repayment of commissions, namely the [Marketing Services Agreement] and the Commission Agreement," both of which were attached as evidence to the motion.

In its response at the trial court and on appeal, FSL notes that the "Marketing Services Agreement" was between FSL and CJA only, and the "Commission Agreement"

was between Hinson and CJA only—there was no agreement governing commission chargebacks to which both FSL and Hinson were signatories. FSL cites *Fortune Production Co.*, 52 S.W.3d at 684–85, and *Norhill Energy LLC v. McDaniel*, 517 S.W.3d 910, 919 (Tex. App.—Fort Worth 2017, pet. denied), for the proposition that the express-contract defense "applies only to the extent a contract *between the parties* actually addresses the matter in dispute" (emphasis added).

We disagree. The cases cited by FSL do not specify that, in order to invoke the express-contract defense, there must be a single written agreement to which both the plaintiff and defendant are signatories. Rather, they state that the express-contract defense applies whenever the matter in dispute is governed by a written agreement. *See Fortune Prod. Co.*, 52 S.W.3d at 684; *Norhill Energy LLC*, 517 S.W.3d at 919. As Hinson notes, this Court held in *Spellmann v. Love* that summary judgment dismissing a money had and received claim was proper under the express-contract defense, despite the fact that the allegedly unjustly-enriched party was not a signatory to the governing contract. *See* 534 S.W.3d 685, 693 (Tex. App.—Corpus Christi–Edinburg 2017, pet. denied).

Here, after Renfro paid the premiums on the subject annuity, FSL paid a commission directly to CJA, which in turn paid a commission directly to Hinson. It is undisputed that, because the annuity was later cancelled and the premiums returned, (1) the "Marketing Services Agreement" required CJA to reimburse FSL for the commission it received,[11] and (2) the "Commission Agreement" required Hinson to reimburse CJA or FSL for the commission he received.[12] Therefore, the matt00er in dispute is governed by

---

[11] The "Marketing Services Agreement" states: "When contributions are refunded within five years of the first premium deposit because the Annuity is Cancelled, or is Void with no legal effect, then [FSL] will chargeback all commissions."

[12] The "Commission Agreement" states: "If the [insurer] shall return the premiums, in whole or in

17

written agreements, and the trial court properly granted summary judgment on FSL's money had and received claim. *See Fortune Prod. Co.*, 52 S.W.3d at 684; *Spellmann*, 534 S.W.3d at 693; *Norhill Energy LLC*, 517 S.W.3d at 919.

We overrule FSL's issue on cross-appeal.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed the
12th day of March, 2020.

---

part, on a policy or certificate of insurance, or cancel a policy for any reason, [Hinson] and [Hinson]'s Representatives shall repay to the [insurer] or CJA, on demand, the amount of compensation received on account of such policy or premiums.